## LUCINDA GAYLORD *vs.* EBENEZER A. KING.

Hampshire. Sept. 22. — Oct. 22, 1886. DEVENS & W. ALLEN, JJ., absent.

In 1787, a town appointed a committee to dispose of the highways in the town, or any part thereof. In 1788, the committee reported that they had laid out the old ways of a certain width, and had measured out and bounded the several pieces of land at the front, rear, or sides of each man's lot bounded on the said new surveyed ways, which pieces of land the town would sell to the respective owners of the lots. The town voted to accept the report of the committee ; that the tracts of land described "be and hereby are granted in fee to " the persons named ; and that, whenever payment should be made, "the town way in each tract respectively should be discontinued." *Held,* that the grant did not pass the fee to the centre of the ways as newly laid out.

The owner of land bordering upon a highway, the fee of which was in the town, petitioned the town to allow him to straighten his fence by extending it a few feet into the highway. A committee appointed by the town reported that the land prayed for would not encroach upon the county way or injure the street, and recommended the town to grant a parcel of land, according to a plan. The town voted to allow the petitioner to enclose a strip of town land in front of his land, on payment of a certain sum, as described in the report of the committee. *Held,* that the grant did not pass the fee to the centre of the way.

The selectmen of a town, by a vote of the town, represented to the county commissioners that the boundary lines of a certain highway had been lost or become uncertain, and prayed that the way be established and determined. The county commissioners, after due proceedings, adjudged that the highway was a certain number of rods wide, and indicated its limits. *Held,* that the town was not estopped by these proceedings from setting up, as against an abutter, a title in fee in the way.

In an action, brought in 1884, for cutting down shade trees, it appeared that they were planted by the plaintiff, in 1866 or 1867, in front of his house, and within the limits of the highway, the fee of which was in the town; and that the defendant was acting under authority from the selectmen of the town. *Held,* that the provision of the Pub. Sts. *c.* 54, § 6, relating to "shade trees standing," did not apply; and that there was no conclusive presumption of law that the plaintiff had a license to plant them.

TORT in two counts. The first count was for removing shade and ornamental trees, the property of the plaintiff, standing in front of her residence in East Street, Amherst. The second count was for breaking and entering the plaintiff's close, and converting the same trees to the defendant's use. Both counts were for the same cause of action. Writ dated September 8, 1884. Answer: 1. A general denial. 2. That the defendant was one of the selectmen of Amherst, who had the care of said street under authority of the town, and who caused the travelled road and path to be widened; that he, acting as highway surveyor and one of the selectmen, and under authority of the board of selectmen, caused the trees to be removed. 3. That Amherst was the owner of the land and soil upon and within which the trees were standing.

Trial in the Superior Court, without a jury, before *Knowlton,* J., who allowed a bill of exceptions, in substance as follows:

It was admitted that the plaintiff owned the premises and residence, in front of which, on East Street, three valuable shade trees had stood for sixteen or seventeen years; and that the defendant, in October, 1883, without notice to or leave from the plaintiff, caused the trees to be taken away by a person, who used them for wood.

The deed to the plaintiff of said premises and residence, in 1854, bounded the same "west on East Street." Ebenezer Mattoon owned the premises in 1789, and, in conveying them in 1830, bounded them "west on East Street." The same premises were conveyed by Mattoon's grantee, and twice subsequently, before the plaintiff took her deed, and were each time bounded "west on," or "westerly by," East Street. There was no other conveyance of the premises between Mattoon's and that to the plaintiff. The only other conveyance of said premises was from Noah Dickinson to Ebenezer Mattoon, dated March 11, 1789, wherein it was bounded "west on a highway."

The trees were planted sixteen or seventeen years before 1883, in the same line with some old shade trees, some of which were two and one half feet in diameter and had become decayed, and they were removed by the plaintiff to set out those in question.

East Street runs north and south; and at the place in question was, when the defendant removed said trees, between one hundred and fifty and one hundred and sixty feet wide. The easterly part of it in front of the plaintiff's premises was a grass plat, in which the trees in question stood, west of which trees was a foot-walk. Westerly of this, a strip was worked for travel. Then an area was grassed over. Then a second strip was worked for travel. Then another grass plat reached to the westerly limit of the highway.

The plaintiff had occupied her premises since 1854, and each year until and including 1883 had mowed the grass plat, on which the old trees and those in question stood, in front of her premises, without objection by, and without asking permission of, any one. There had been a door-yard fence in front of said premises, which had been removed some years before the defendant's acts. It marked the easterly limit of the highway. The trees in question stood westerly of the line of this fence, but considerably east, or on the plaintiff's side, of the centre of the way.

The case was referred to an auditor, who reported that "the plaintiff at the time of setting out the trees in question had no authority or license, either verbal or written, to do the same, from the selectmen, road commissioners, or any municipal officer of Amherst to whom the care of the streets or roads may be entrusted." The report was read at the trial, and there was no other evidence touching the question of license or authority, unless the other facts herein stated may be considered evidence on that point. It was admitted that no objection was made to the planting or maintaining the trees by any officer of Amherst, or by the public, or by any one.

The defendant was a selectman for 1883. The town voted, in March of that year, that the highways and bridges be placed in charge of the selectmen. It also voted a special appropriation of $200 "for the East Street road," which sum was being expended by the selectmen, who had decided what repairs and alterations to make, and the defendant was entrusted with the

execution of them by his associates. In making such altera-
tions, the easterly travelled track was moved to the east, but
within the limits of the highway, and upon the place where said
trees had stood which were cut and removed by the direction
of the defendant. No other proceedings had been had by the
selectmen, or by the town, relative to altering the said way.

On the question of title to the soil within the limits of the
highway, to show that it was in the town of Amherst, it appeared
that Hadley was incorporated in 1661; that in 1673 its bounds
were established as follows : " Bounds shall run from their meet-
ing-house, five miles up the river and five miles down the river
and six miles from their meeting-house eastward." The second
precinct in Hadley was incorporated in 1759, as the District of
Amherst. By the St. of 1785, c. 75, § 9, approved March 23,
1786, all places incorporated by the name of districts before
January 1, 1777, were declared to be towns, to every intent and
purpose whatever. There was no evidence of any conveyance
from Hadley to the district, or to the town of Amherst.

On March 4, 1700, Hadley passed the following votes : " Voted,
that three miles and one quarter eastward from the' meeting-
house, and so from the north side of Mt. Holyoke unto the Mill
River, shall lye as common land forever, supposing that this line
will take in the whole of the new swamp. Voted, that the rest
of the common eastward shall be laid out in three divisions, that
is to say, betwixt the road leading to Brookfield and the Mill
River, notwithstanding there is liberty for the cutting wood and
timber, so long as it lyeth unfenced. There is likewise to be left
betwixt every division forty rods for highways. And every one
to have a proportion in the first or second division. And every
one to have a proportion in the third division ; and every house-
holder to have a fifty pound allotment. And all others who are
now the proper inhabitants of Hadley, from sixteen years old
and upwards, to have a five and twenty pound allotment in said
common."

In March, 1745, Hadley voted, that "whenever the town
measurers have laid out, according to our order, three divisions
of land east of our towne, that we desire the clerk to record
said lands in the town's book together, in the same order as
they were drawn for by the inhabitants according to the list

presented by said measurer, for the doing of which we will pay what is reasonable out of the town rate."

The third division lies between East Street and the Pelham line. The plaintiff's premises are in said third division, and within the original Hadley, namely, six miles from their meeting-house eastward. East Street is the remainder of one of the old highways.

In November, 1787, Amherst passed the following votes: "Voted, to sell some part of the town highways. Voted, that the highways north and south shall be in no place less than six rods wide, where they are now so wide. Voted, that the committee act discretionary as to the width of the cross highways. Voted, to choose a committee to dispose of said highways, or any part thereof, as they think proper. Voted, that [naming nine persons] be the committee aforesaid."

On January 14, 1788, the said committee reported, at a meeting of the inhabitants, that they had, pursuant to the instructions of the town, laid out and surveyed a town way six rods wide between the first and second divisions; and another, between the second and third divisions, of the same breadth, except that, in the way between the second and third divisions, they had laid out the way but four rods wide from the Bay Road to the north side of Stoughton Dickinson's house lot, and excepting also that in several places the committee had left and reserved the whole breadth of the former way for particular or public use; that the said newly laid ways were within the old town ways, and for the most part contained the county roads.

Said committee also reported that they had laid out ways in the same manner across the divisions from west to east, four rods wide; that they had measured out and bounded the several pieces of land at the front, rear, or sides of each man's lot bounded on the said newly surveyed ways, which pieces of land the town would sell to the respective owners of the lots (if they thought proper); that the committee had also appraised each of said pieces of land according to their best skill and judgment, and exhibited to the town a particular list of their locations and appraisements; that the following exhibition showed the names of the men against whose lands the said pieces of land were laid out for sale, then the quantity of land in acres and rods, the several prices by the acre, and the amount of the lands laid out

for each man to purchase, from the Bay road north, between
the second and third divisions:

| Owners of Lots and Descriptions. Jacob Warner, Jr. 8 rods wide, 19 rods long. | Quantity of Land. | Price per Acre. | Sums to be Paid. |
|---|---|---|---|
|  | 152 rods. | £1-0-0 | £0-19-0 |

The report contained one hundred and forty-three pieces, re-
corded as above.  The several sums affixed to the respective
names contained in the foregoing list amounted, according to
the computation made by the committee, to the sum of five hun-
dred and thirty-three pounds nine shillings and eleven pence,
" but there are several former grants included in the foregoing
appraisement which the committee could not without difficulty
ascertain, and are therefore left to be deducted from the appraise-
ments respectively."

The committee also reported, that the lands left for a way
from Leverett bounds to Mill River, and the lands left between
Lt. John Dickinson's and Justin Williams's farm in the first di-
vision, were not reported by the committee, but were left to be
thereafter disposed of by the town as they should think proper.

The town voted to accept the report of the committee, and
that the tracts of land laid out and described to the persons
respectively named in said report " be and hereby are granted
in fee to the said persons and their heirs respectively," on con-
dition that they pay the sums whereat the several tracts were
respectively appraised to the town treasurer, or give security;
and that, whenever said payment should be made or security
given, the town way in each tract respectively should be dis-
continued, provided that the lands in said report described to
(three persons named) be excepted out of the grant, and re-
served to the further order of the town.  The land relating
to the premises now owned by the plaintiff was not one of the
pieces excepted in the report or vote.

East Street was by said proceedings narrowed at the place in
question, and by a still further narrowing there, hereinafter men-
tioned, was reduced to its present dimensions.  In November,
1809, Ebenezer Mattoon (then owner of the plaintiff's premises)
and two others petitioned the selectmen to insert an article in
the warrant for the next town-meeting, to see if the town would
allow them to straighten their fences on the east side of the

highway, from Mattoon's garden fence to the lane leading to Clapp's house, by extending them a few feet into the highway, and make such order thereon as might be thought proper. At a meeting of the qualified voters, December 7, 1809, it was voted, in pursuance of the third article, on the petition of Ebenezer Mattoon, Esq., and others, praying for an alteration in the highway near his dwelling-house, to choose a committee of three to view the ground where the alteration is prayed for, and report their opinion thereof at a future meeting.

A committee was chosen, who, at the March meeting, 1810, reported that the land prayed for would not encroach upon the county road, nor do any injury to the street; they therefore recommended to the town to grant the petitioners and others therein named the lands in front of their respective lots, which lands were bounded and described in the plan therewith exhibited, a copy of a portion of which is printed in the margin,* " beginning at the corner of Noah D. Mattoon's fence and running south 16° west ninety-four rods, to a post in Lt. Noah Dickinson's fence, a little south of the brook, and appraised the land in front of each man's lot: To Lt. Noah Dickinson, three quarters of a rod, at seventy-five cents; Ebenezer Mattoon, thirteen rods, at $13." Other sums to three other persons. - The committee also reported that they had gone further in their appraisement of land than the original petitioners expected, but they found it would ornament the street without injury to any, and as people were generally desirous of the measure, they presumed to extend their commission to others as well as the petitioners.

The committee recommended the town to grant the lands described to the persons named in their report, upon the payment of the sums affixed to each person's name.

It was admitted at the trial that said Mattoon's premises were at or about the point marked " A " on the plan, the highway as left being immediately west of the straight line west of it.

At a legal town meeting, held on April 2, 1810, it was voted, in pursuance of an article in the warrant, to accept the report

---

*

of the committee appointed at the last December meeting, on the petition of Ebenezer Mattoon, Esq., and others, praying that the town would allow them the privilege of straightening their fence and of enclosing a strip of town land in front of their lands, which report is favorable to the' petitioners, and allows them, together with certain other persons therein named, for the sums therein severally expressed, to enclose each a strip of town land in front of their possessions particularly described and laid down in the same report, which report is on file, and is to be considered part of this record, and the lands therein described granted to the several persons therein named.    The way was accordingly narrowed.

It appeared that, in June, 1883, the selectmen, by vote of the town, represented to the county commissioners, by their petition, that the boundary lines of East Street had been lost or become uncertain, and prayed them to determine and establish the highway by suitable and permanent monuments.    The commissioners accordingly, after due proceedings, adjudged that the highway at the place in question " is laid " a certain ascertained number of rods wide, expressed in their decree, and located permanent bounds to indicate the limits of the highway.    The location thus ascertained or determined covered the three grass plats and two worked strips hereinbefore described, and left the place where said trees stood east, or on plaintiff's side, of the centre of the highway.

. The plaintiff requested the judge to rule as follows : " 1. If the trees in question were planted by the plaintiff, sixteen or seventeen years ago, in the same line with ancient trees which had become decayed, and which were removed for the purpose of planting the new ones in front of her premises, on her side of the centre of the street, between her house and the sidewalk on her side of it, and were kept there, without objection by any officer of Amherst or the public, until removed by the defendant, a license to plant them there would be presumed.    2. If Amherst owned the fee in the soil of the highway forty rods wide in 1787, when it voted to sell some part of the highways, and sold to the plaintiff's predecessor more than half the width of the highway in front of his lot as it then existed, the vote of November 12, 1787, the report of the committee of January 14,

1788, and its acceptance by the town in April, 1788, whereby it granted the same in fee to said predecessor and his heirs, the same would convey the fee to the centre of the highway, and the subsequent conveyances of the lot as thus enlarged, bounding the same on said highway, would convey the fee to the centre to the successive grantees. 3. But if said votes and proceedings did not pass the fee to the centre, and if the fee was still in Amherst thereafter, the vote of April, 1810, granting to Ebenezer Mattoon thirteen rods of land in the highway in front of his land, passed to him the fee to the centre of the road, and the subsequent conveyances of it, through several parties, to the plaintiff, bounding it on said street, passed the fee to the plaintiff. 4. The petition of the selectmen of Amherst, by vote of the town in 1883, setting out that the boundary lines of the highways in question had been lost or become uncertain, praying the commissioners to establish the road, and whereby they obtained an adjudication establishing the way in question covering the locus where the trees stood, estops the town and the defendant in this action from claiming that the town owns the fee in the soil under said road."

The judge refused to give any of said rulings; and found for the defendant. The plaintiff alleged exceptions.

*W. G. Bassett*, for the plaintiff.

*T. G. Spaulding*, for the defendant.

C. ALLEN, J. The first question which we have considered is, whether the plaintiff has shown a title in herself to the soil of that part of the highway where the trees stood; and we think she has not. She relies, primarily, upon the grant by the town in 1788, and upon the rule of law, now well established and familiar, that grants of land bounding on a way will be presumed to extend to the centre of the way, if the grantor owns the soil thereof, and if a clear intention to the contrary is not to be gathered from the language of the deed, construed in the light of the existing circumstances. In the present case, such clear intention to the contrary sufficiently appears. It is assumed, throughout the discussion, that, prior to the proceedings of 1787 and 1788, the town owned the whole street in fee. The street was then wide, and the whole purpose of the proceedings was to narrow it. The land conveyed was not independent land bounding

on the street, but was a part of the street; it is nowhere in the grant itself expressed, in terms, to be bounded on the street or way. Those words are used only in the report made to the town by its committee. We look in vain for any indications of an intention, on the part of the committee or of the town, to change the nature of the title of the town in the soil of the ways as newly laid out. Every presumption is against it. The town was a continuous corporate body, having perpetual succession, and no heirs. Owning the whole street, no reason can be conjectured why, in carrying out its plan of narrowing it, an intention should be inferred to convey the soil to the centre. If in any place the street were narrowed by taking a small strip on each side, and the street should afterwards be discontinued, the construction contended for would lead to the result that the town's title would then be only in separate isolated lots. As a part of the vote granting the land, it was provided that "the town way in each tract respectively should be discontinued;" words which throw a strong light upon the intention and understanding of the parties at the time. On the whole, without at all departing from the general rule for the construction of grants bounding upon a way, it is manifest that the intention of the town was merely to grant the land over which the town way was to be discontinued. See *Phelps* v. *Webster*, 134 Mass. 17.

The proceedings and votes of the town in 1809 and 1810 afford no ground for inferring an intention to grant the soil to the centre of the street, for reasons which are covered by what has been said in reference to the proceedings and vote of 1787 and 1788.

The plaintiff contends that the town is estopped to deny her title, by reason of the proceedings in 1883; but the town thereby lost no title which it already had to land included in the street. It is quite probable that by far the larger portion of the land included in the highway as laid out by the county commissioners was clearly and without dispute included in the way as already existing, and there is nothing to show that the place where the trees stood was then for the first time taken into the highway. Indeed, it is plain that it was not so. Nor could the proceedings of the commissioners deprive the town of land which it owned in fee. The essential elements of an estoppel are wanting.

It thus appearing that the plaintiff did not own the land on which the trees stood, that portion of the Pub. Sts. *c.* 54, § 6, reënacting the Gen. Sts. *c.* 46, § 6, applicable to "shade trees standing," does not apply; and the only remaining question is, whether these trees are shown to have been shade trees planted pursuant to a license or authority of the selectmen, or other proper municipal officer. The plaintiff contends that there is a legal presumption of such license or authority, arising from the facts that they were planted and have remained sixteen or seventeen years without objection, and that she had mowed the grass there for nearly thirty years. Such presumption, in order to be effectual for the plaintiff's purposes, must be a conclusive presumption; since the auditor's report, which there were no facts to control, states explicitly that the plaintiff had no such authority, either verbal or written. But there is no such conclusive legal presumption. The mere absence of expressed objection is not sufficient to meet the requirement of the statute. There must be enough to show, by inference or otherwise, an actual license or authority, which is negatived here. -

*Exceptions overruled.*