Coös,    }
June, 1894. }

### SMITH & a. v. FURBISH.

68   123
f70   251

68   123
71   424
71   550
71   583
71   584

In a conveyance of land bounded on one side by a river a certain distance and extending back far enough to include an acre, the bed of the river is not ordinarily included in the measurement of the acre.

In the construction of a deed, when the evidence of intention is not exactly balanced, there is no occasion to apply the rule, *contra proferentem.*

When the owner of land on both sides of a river conveys the land on the east side, reserving the right to build a dam across the river at any point and also reserving an acre of land in the vicinity of the dam on the east side, he retains the title to a mill privilege on both sides of the river as appurtenant to his land on the west side, and has the right to elect, within a reasonable time, where the dam and the acre shall be located.

In such case the rights reserved are not void for uncertainty and the law furnishes adequate procedure for their vindication.

A grantor's reservation of a part of the described premises which is appurtenant to other land owned by him, with no reference to his heirs or assigns, does not necessarily show a purpose to make his estate in the reserved part a life estate.

The granting of an estate to A, "his heirs and assigns forever," and a reservation in the same deed to the grantor of a part of the described premises, without the use of that redundant expression, does not indicate a purpose to reserve a life estate only.

When the location of reserved premises is to be made certain by the election of the grantor, his successor in the title may ordinarily exercise the right within a reasonable time after the date of the original deed, if the former has omitted to do so.

WRIT OF ENTRY. Facts agreed. The plaintiffs demand of the defendant the possession of a lot of land, numbered four in the tenth range of lots in Berlin. Both parties claim title under one Cross. May 11, 1865, Cross conveyed to the defendant's grantor, Wilson, the premises in question, which were described in the deed as follows: "A certain piece of land being all that part of lot numbered four in the tenth range of lots in said Berlin, laying on the east side of the Androscoggin river, reserving to myself the right of building a dam across said river at any point against said land, together with the right of flowage of said land, at any and all times caused by said dam when constructed. Also reserving a piece of land fronting on said river in the immediate vicinity of the east end of said dam, twelve rods in length on the bank of said river and extending back far enough, same width, to comprise one acre of land. Said Wilson to have the timber on said acre of land." October 14, 1865, Cross conveyed to one Smith one half part, in common and undivided, of all his interest in said lot. Smith and Cross are dead, and the plaintiffs are their heirs, who claim title under the reservation in Cross's deed to Wilson. Other facts appear in the opinion.

*William L. Foster*, for the plaintiffs.

*Ladd & Fletcher*, for the defendant.

DOE, C. J. Lot 4 of Range 10 in Berlin is under and on both sides of the Androscoggin river, which flows in a southerly direction. Between these claimants of water-power, it is a matter of importance that the bed of the river is a part of the lot, and that every acre, bounded easterly or westerly by the river, extends to the center of the stream. While the portion of the lot on the east side may be conveniently called the east section, and the other portion the west section, the thread of the river is, in this case, an

immaterial line except at the points where it has become a boundary of adjoining owners. Where both banks and the bed belong to the plaintiffs, no light is thrown on their rights by dividing the bed into two parts, or drawing a line between it and the bank on each side. Their channel and their adjoining upland are one tract. Their right to build a dam on it and flow their own territory is an element of their title. Their right to flow the defendant's part of Lot 4 is presumed to be an appurtenance of their land. "Though an easement . . . may be created by grant in gross, as it is called, or attached to the person of the grantee, this is never presumed when it can fairly be construed to be appurtenant to some other estate." Wash. Ease. *28; *Spensley* v. *Valentine*, 34 Wis. 154, 160; *Kuecken* v. *Voltz*, 110 Ill. 264, 268, 269; *McMahon* v. *Williams*, 79 Ala. 288, 291. It is a natural inference of fact that the plaintiffs' right of flowage, expressly reserved by deed, was intended to be attached to the soil on which by the terms of the same deed the dam was to be built. "The right of flowage . . . caused by said dam when constructed" was evidently reserved as a part of a mill privilege, for the benefit of a mill to be operated by water to be raised by the dam, and is fairly construed to be appurtenant to the land of which the mill and dam will be a part.

Cross, being the owner of Lot 4, conveyed a part of the east section to Wilson. The deed is clear, full, and precise. The grant is of "a certain piece of land being all that part of lot numbered four in the tenth range of lots in said Berlin, laying on the east side of the Androscoggin river. Reserving to myself the right of building a dam across said river at any point against said land, together with the right of flowage of said land, at any and all times caused by said dam when constructed. Also reserving a piece of land fronting on said river in the immediate vicinity of the east end of said dam, twelve rods in length on the bank of said river and extending back far enough, same width, to comprise one acre of land. Said Wilson to have the timber on said acre of land." This conveyance was made in 1865. In 1888, Cross being dead, the plaintiffs, as his successors in title, surveyed an acre according to the description given in the reservation, marked it on the ground, informed the defendant, the successor of Wilson, that they intended "to locate a dam there," and requested him to remove the timber. This suit is a writ of entry for that acre. The defendant contends that the reservation of an acre was void for uncertainty, and that in "the right of. building a dam" and "the right of flowage" Cross reserved only a life estate.

I. A deed of a lot of land in Manchester, describing it as "fronting westerly on Merrimack river and easterly on Elm street, 12 rods in length on the bank of said river and 12 rods on said street," would convey the grantor's title from the middle of the

river to the middle of the street. An intent that the soil in the river and street shall be owned by a person who does not own the abutting land is so improbable that it would require an express exception in the grant, or some clear and unequivocal declaration, or certain and immemorial usage,.to limit the title of the grantee to the edge of the street and the edge of the river. 3 Kent 428; Wallace's note in *Dovaston* v. *Payne*, 2 Sm. L. C. (4th Am. ed.) 189; Dissenting opinion of *Redfield*, J., in *Buck* v. *Squiers*, 22 Vt. 484, 494; *Norcross* v. *Griffiths*, 65 Wis. 599; *Claremont* v. *Carlton*, 2 N. H. 369, 371; *State* v. *Gilmanton*, 9 N. H. 461, 463; *Greenleaf* v. *Kilton*, 11 N. H. 530, 533; *State* v. *Canterbury*, 28 N. H. 195, 216; *Woodman* v. *Spencer*, 54 N. H. 507, 512, 514, 516; *Sleeper* v. *Laconia*, 60 N. H. 201, 202; *Taylor* v. *Blake*, 64 N. H. 392; *Kent* v. *Taylor*, 64 N. H. 489, 490; *Capron* v. *Kingman*, 64 N. H. 571. Such a limitation in the case of a street would be contrary to universal practice (3 Kent 433), and the presumed intent is the same whether the boundary is a street or a fresh water river. On the question of fact whether certain phrases or circumstances are sufficient evidence of a different intent (*Gould* v. *Railroad*, 142 Mass. 85, 89; *Gaylord* v. *King*, 142 Mass. 495, 503; *Holloway* v. *Southmayd*, 139 N. Y. 390, 401, 412; Tied. R. P., ss. 833, 837), there has not been a unanimity of opinion in all jurisdictions; but the presumption is regarded as an established rule; and in this state it is settled (in cases before cited) that such terms as those used in Cross's reservation do not prove an intent to sever the channel of the river from the riparian estate of which it is presumed to be a part.

If a Manchester lot, abutting on Merrimack river and Elm street, were described in a deed as extending northerly from a given line far enough to comprise twenty-five acres, or 25,000 square feet, the quantity of measured land would be less than the area of the granted premises. Whether the price were a lump sum, or $1,000 an acre, or $10 a foot, the east half of the river and the west half of the street would not be included in the measurement. The law takes notice of the fact that the bank of the Merrimack is a more convenient place for monuments than the center of the stream. *Gouverneur* v. *Ice Co.*, 134 N. Y. 355, 365. In material elements of utility and value, the river and street differ from ordinary land in which the owner has a right of exclusive occupation. *Lord* v. *Commissioners*, 12 Moore P. C. 473, 497; *Woodman* v. *Spencer*, 54 N. H. 507, 513. The usage and understanding of the community (judicially noticed as evidence of the meaning of a deed), and the character of the use generally made of a river and street, would show that the half of each, which passes by a conveyance of an abutting lot, is not within the specified dimensions. *Gouverneur* v. *Ice Co.*, *supra*; *Holbert* v. *Edens*, 5 Lea 204; *Jones* v. *Pettibone*, 2 Wis. 225; *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, 286,

287; *Jefferis* v. *Land Co.*, 134 U. S. 178, 196; *Hardin* v. *Jordan*, 140 U. S. 371, 380, 381, and cases there cited; *Salisbury* v. *Railway*, 5 C. B. N. S. 174, 209; *Berridge* v. *Ward*, 10 C. B. N. S. 400, 402, 408, 411, 414, 415; *Pryor* v. *Petre*, L. R. [1894] 2 Ch. 11.

The erroneous rule, that a line described as running "on the bank" of a river disproves an intent to make the river the boundary, is supposed to have been adopted in the unreported case of *Alcock* v. *Little*, decided in 1815, and was recognized as sound in a dictum in *Rix* v. *Johnson*, 5 N. H. 520, 523, 524. In *Daniels* v. *Railroad*, 20 N. H. 85, 88, a deed from the plaintiff to the defendants named the bank of Connecticut river as the western boundary, and described the premises as situated between the river and a given line. Cold river passed through the premises, but was not mentioned in the deed. In a written contract, reciting the conveyance, the defendants promised to pay for "said land lying on both sides of Cold river, accurately measured . . . at the rate of $100 per acre, except so much thereof as is highway." The suit was assumpsit for the agreed price. It was held that the deed conveyed the bed of Cold river, and that the grantees were not bound to pay the agreed price per acre for the bed of either of the rivers. It was wrongly held that the deed conveyed no part of the bed of the Connecticut. In determining the sum for which the plaintiff was entitled to judgment, it was not material whether the deed conveyed the whole bed (*Cornish Bridge* v. *Richardson*, 8 N. H. 207, 210; *State* v. *Canterbury*, 28 N. H. 195, 219, 221; *Crosby* v. *Hanover*, 36 N. H. 404, 413; *Lumber Co.* v. *Columbia*, 62 N. H. 286), or only the east half of it, or none of it. A provision in the contract excepting from measurement the Connecticut highway (*Lumber Co.* v. *Company*, 65 N. H. 290, 377) would have been as superfluous as the clause excepting so much of the granted premises "as is highway." *Firmstone* v. *Spaeter*, 150 Pa. St. 616, is in conflict with our law. When the banks and bed of a brook are a part of a conveyed lot, the bed is generally included in the measurement. But a sale of a number of acres or square feet, bounded by the Connecticut, the Merrimack, the Androscoggin, or a street, is understood here not to require a measurement of the river or street; and a price per acre or foot is understood not to be the price per acre or foot of river or street. The price of the title which the purchaser acquires in the bed of the river or the street is a part of the agreed price of the measured land.

II. The rule that a deed is "taken most strongly against him that is the agent or contractor, and in favor of the other party, . . . being a rule of some strictness and rigor, is the last to be resorted to; and is never to be relied upon but where all other rules of exposition fail." 2 Bl. Com. 380. "The modern and more reasonable practice is to give to the language its just sense, and to search for the precise meaning, and one requisite to give

due and fair effect to the contract, without adopting either the rule of a rigid or of an indulgent construction." 2 Kent 557. " Where all other rules of exposition fail" is a description (less appropriate now than formerly) of the situation of a case in which there is no preponderance of evidence in favor of either party. When the evidence is not exactly balanced, there is no opportunity to use the rule *contra proferentem.* "If the sense of the words be *in equilibrio,* the rule of law will apply." *Bayley,* J., in *Love* v. *Pares,* 13 East 80, 86. It cannot be applied in this case where there is no equilibrium. Whether it is ever useful where intent is a question of probability and the law of the burden of proof is duly observed, is no part of the present inquiry.

" ' Where a word having a technical as well as a popular meaning is used in the constitution, the courts will accord to it its popular signification, unless the very nature of the subject indicates, or the text suggests, that it is used in its technical sense.' *Weill* v. *Kenfield,* 54 Cal. 111; *Sprague* v. *Norway,* 31 Cal. 173. Words used in a constitution should be construed in the sense in which they were employed. They 'must be taken in the ordinary and common acceptation, because they are presumed to have been so understood by the framers, and by the people who adopted it. . . . It . . . owes its whole force and authority to its ratification by the people; and they judged of it by the meaning apparent on its face according to the general use of the words employed, where they do not appear to have been used in a legal or technical sense.' *Manly* v. *State,* 7 Md. 135." *Miller* v. *Dunn,* 72 Cal. 462, 465. The same natural mode of construction is applicable to wills and deeds. When a word appears to be used in a technical or peculiar sense, its apparent meaning is its legal meaning. But there is no legal presumption that all testators and contracting parties are lawyers, or that their understanding and use of language is peculiar. *Verba intentioni debent inservire. Benigne interpretamur chartas propter simplicitatem laicorum.* Co. Lit. 36 a. Therefore the construction must be "reasonable, and agreeable to common understanding." 2 Bl. Com. 379.

" The terms of every written instrument are to be understood in their plain, ordinary, and popular sense, unless they have generally, in respect to the subject-matter, as by the known usage of trade, or the like, acquired a peculiar sense, distinct from the popular sense of the same words; or unless the context evidently points out that, in the particular instance, and in order to effectuate the immediate intention of the parties, it should be understood in some other and peculiar sense." 1 Gr. Ev., s. 278; Chit. Con. 79, 81; *Perkins* v. *Mathes,* 49 N. H. 107, 110. " It is the office of the judges to take and expound the words which common people use to express their meaning, according to their meaning." *Hill* v. *Grange,* Plow. 164, 170; *Williams,* J., in *Winter* v.

*Perratt*, 6 M. & G. 314, 336. " The bulk of mankind act and deal
with great simplicity; and on this is founded the rule that *benig-
næ faciendæ interpretationes cartarum propter simplicitatem laicorum.*
Words are to be taken in their popular and ordinary meaning,
unless some good reason be assigned to show that they should be
understood in a different sense. . . . *Si nulla sit conjectura quæ
ducat alio, verba intelligenda sunt ex proprietate, non grammatica sed
populari ex usu.*" 2 Kent 555.

"An agreement or contract shall have a reasonable construc-
tion, according to the intent of the parties." Com. Dig., Agree-
ment (C). Their agreement is enforced " according to the sense
in which they mutually understood it at the time it was made.
. . . The construction shall be reasonable, . . . as near the minds
and apparent intents of the parties as the rules of law will admit.
And it is essential to consider the subject-matter of the agree-
ment, in affixing a meaning to the terms used therein. . . .
Every contract is to be construed with reference to its object, and
the whole of its terms; and accordingly the whole context must
be considered in endeavoring to collect the intention of the par-
ties, even although the immediate object of inquiry be the mean-
ing of an isolated clause." Chit. Con. 74, 83. The whole instru-
ment is to be read, and applied to the subject-matter, to ascertain
the primary and leading purpose of the parties; and an ambigu-
ous word or phrase is to be construed, if it reasonably may be,
so as best to promote and accomplish that purpose. *Warren* v.
*Merrifield*, 8 Met. 93, 96; *Bellows* v. *Denison*, 9 N. H. 293, 295;
*N. H. Bank* v. *Willard*, 10 N. H. 210, 213; *Sherburne* v. *Goodwin*,
44 N. H. 271, 275; *Salmon Falls Co.* v. *Company*, 46 N. H. 249,
254, 255; *Corwin* v. *Hood*, 58 N. H. 401, 402; *Blanchard* v. *Ames*,
60 N. H. 404, 406.

III. The primary and leading purpose of Cross's reservation
was to leave in him the title of a mill privilege which was situated
under and on both sides of the river, and which Wilson did not
buy or pay for. The integral and exclusive character of the
water rights which Cross did not convey is obvious. While he
retained the west section, an acre of the east section, a right to
build a dam across the river, and a right to flow the east section,
he conveyed to Wilson no right to flow the west section. The
quantity of both sections to be flowed depends upon the location
and height of the dam, and is to be determined by the owner of
the privilege electing where and how high the dam shall be.
*Goodrich* v. *Longley*, 1 Gray 615. The price paid by Wilson for
what he bought was not fixed on the basis of his right to destroy
the value of the reservation by locating the dam and the acre
where they would be worthless for the purposes of a mill. The
construction that gives effect to the intent of the parties is, that
the right of location belongs to the owner of the reserved prop-

erty. It is not necessary to examine the correctness of the view that gives him the election, because he is the party who ought to do the first act, viz., to build the dam and use the water-power and the acre. *Heyward's Case*, 2 Co. 35, 37; Co. Lit. 145 a; Com. Dig., Election (A 1), (A 2); 1 Benj. Sales (Am. ed., 1884), s. 489.

If the reservation had been of a mill site with no specification of locality or quantity, it would have retained in Cross and his assigns as much land as was reasonably necessary for building and carrying on the business of a mill at any place in Lot 4, on the left bank of the river, that he or they might select. *Jackson* v. *Vermilyea*, 6 Cow. 677, 678. If the parties in interest disagreed as to the quantity, the question of reasonable necessity could be determined on a bill in equity brought by any of them against the others. A similar question is considered in those cases in which it is held that a quantity of land, reasonably necessary for the use of a mill, house, rope-walk, or wharf, is conveyed by a deed of the structure, with no metes or bounds, and no express mention of land. *Blake* v. *Clarke*, 6 Me. 436, 439, 440; *Gibson* v. *Brockway*, 8 N. H. 465, 471; *Bean* v. *Brackett*, 34 N. H. 102, 119; *Winchester* v. *Hees*, 35 N. H. 43, 47, 48; *Davis* v. *Handy*, 37 N. H. 65, 71; *Marston* v. *Stickney*, 58 N. H. 609, 610; *Doane* v. *Association*, 6 Mass. 332; *Allen* v. *Scott*, 21 Pick. 25; *Forbush* v. *Lombard*, 13 Met. 109, 114; *Johnson* v. *Rayner*, 6 Gray 107; *Blaine* v. *Chambers*, 1 S. & R. 169, 172, 174; *Chicago, etc., Railway* v. *Railroad*, 143 U. S. 596, 613-615. The form of the acre reserved by Cross is definitely described in the deed;—the river is its western boundary; and the acre and the dam are to be in the immediate vicinity of each other. The uncertainty of the reservation is not an equitable or a legal reason for denying to the owner of the reserved estate the protection of the remedial law applicable to cases in which the quantity as well as the locality of conveyed or reserved land depends upon a reasonable necessity, determinable as a judicial question when the parties do not agree, or the owner refuses to make a location in due time.

Under the stipulation of the deed that Wilson should "have the timber on said acre," he could cut it as soon as the deed was delivered. If Cross selected and marked the acre, and Wilson obstructed the erection of a mill upon it by neglecting for an unreasonable time to remove the timber, this wrong would not operate as a conveyance of the timber to Cross. *Plumer* v. *Prescott*, 43 N. H. 277; *Hoit* v. *Stratton Mills*, 54 N. H. 109. In *Irons* v. *Webb*, 41 N. J. Law 203, the plaintiff conveyed land to the defendant "excepting and reserving the timber on the said land, . . . for the removal of which the said party of the second part agrees . . . that he . . . will give two years from the date hereof." "If the contention of the defendant is right [says *Beasley*, C. J., delivering the opinion of the court, *p.* 205], then this

timber continued to be the property of the plaintiff up to the running out of the two years, and then, by its non-removal, it became forfeited and passed to the defendant; and it is entirely obvious that such a condition is not favored in law, and that it will not be raised up by implication, unless by the force of demonstrative indication. Looking at the terms of the present agreement and its subject-matter, I can see no mark, certainly no decisive mark, signifying that it was the intention of these parties that by the plaintiff's neglect to remove the timber it should be forfeited to the defendant. Such a purpose, it is certain, is not contained in any part of the language of the instrument, for it nowhere says that, in any event, the title to the timber is to pass to the grantee. . . . If the timber was permitted to remain on the premises until the time of removal had expired, it became unlawful to enter for the purpose of taking it away. But the effect of such an incident is not in law to work a forfeiture of title." When chattels are wrongfully left by their owner on another's premises, the landowner's remedies do not include "the exorbitant method of a forfeiture."

The system of law that furnishes ample procedure for the protection of rights, and does not impose the penalty of forfeiture for a neglect to remove timber in a reasonable time (when that remedy would be inordinate), did not inflict upon Cross, his heirs or assigns, the forfeiture of an acre of land or a right to an acre, as a remedy for the fault of not exercising the power of selection in a reasonable time. It does not appear that any owner of the Wilson interest has been damnified by such fault, or would suffer any loss or inconvenience if the acre were not located for one hundred years, or that any owner of the Cross interest has had notice, or reason to believe, that location was desired by anybody. In this state of things it is by no means clear that twenty-three years exceeded the limit of reasonableness. But there is no occasion to examine this point.

Any delay, of which a well-grounded complaint could be made by Wilson, his heirs or assigns, could be speedily ended on a bill in equity brought by him or them. If Cross, his heirs or assigns, did not exercise the power of location in a reasonable time, it could be exercised by a judicial tribunal. *Starkie* v. *Richmond*, 155 Mass. 188, 197; *Gardner* v. *Webster*, 64 N. H. 520, 522, 523; *Lumber Co.* v. *Company*, 65 N. H. 290, 390-392. The parties might disagree on the question whether high or low water mark was the line from which the acre was to be measured. Various questions might arise, as to location and measurement, which the plaintiffs were not bound to decide at their peril, and which could be determined on a bill in equity. Selection was division. Before severance, the granted and reserved premises were held as an undivided estate. Between it and land owned in common there

was no difference that exempted the east section from the legal process of partition, or deprived the reserved property of the security which a tenant in common has (*Campbell* v. *Campbell*, 13 N. H. 483; *Clark* v. *Wood*, 34 N. H. 447, 453; *Perkins* v. *Eaton*, 64 N. H. 359, 361; *Leach* v. *Beattie*, 33 Vt. 195; *Holley* v. *Hawley*, 39 Vt. 525, 531; *Fairclaim* v. *Shackleton*, 5 Burr. 2604; Tied. R. P., *ss.* 251, 700) against his co-tenant's acquisition of title by prescription. *Newmarket Co.* v. *Pendergast*, 24 N. H. 54, 66–69, is not overlooked. Location, measurement, and other forms of specific adjustment may be needed in many cases; and such procedure may be invented and used as justice and convenience require. *McDuffee* v. *Railroad*, 52 N. H. 430, 449, 451; *Boody* v. *Watson*, 64 N. H. 162, 171, 173, 178, 179; *Holt* v. *Antrim*, 64 N. H. 284, 287. A limited supply of precedents and an inadequate doctrine of procedure have promoted the judicial introduction of rules of construction, and other so-called rules of law, which often conflict with rights plainly intended to be established by contracts and wills. In this state an unjust judgment cannot be based on a defect in the remedial branch of the common law, or on a formula of construction not enacted by legislative power, or on an unwritten rule the reason of whose existence has ceased.

"Many things that are uncertain of themselves, being reduced to certainty by such means as either the law appoints or the party himself assigns, may take effect." *Stukeley* v. *Butler*, Hob. 168, 174. "If a man grants twenty acres, parcel of his manor, without any other description of them; yet the grant is not void, for an acre is a thing certain, and the situation may be reduced to a certainty by the election of the grantee." Bac. Abr., Election (A). In a great mass of authorities, election is assumed to be a means of removing uncertainty. "If I have three horses, and I give you one, . . . the election ought to be made in the life of the parties, for inasmuch as none of the horses is given in certain, the certainty and thereby the property begins by election. And with that agreeth 10 Eliz. 281, *Bullock's Case;* the Bishop of Sarum, having a great wood of 1,000 acres, . . . enfeoffed another of an house and 17 acres, parcel of the wood, and made livery in the house, none of the wood passed before election, and therefore his heir shall not make election. . . . If I give you one of my horses, in my stable, . . . you shall have election. . . . And if one grant to another 20 loads of hazel, or 20 loads of maple, to be taken in his wood of D., . . . the grantee shall have election; for he ought to do the first act, *scil.*, to cut and take it." *Heyward's Case*, 2 Co. 35–37; Co. Lit. 145 a. "44 E. 3, 43, is a good case. A prior sold his woods, excepting forty of the best oaks, at his choice, to be taken within two years; then the prior brought an action of trespass against the vendee for felling them. He pleaded, that the plaintiff delaying his choice till the two years were almost

expired, he could forbear the felling no longer, but his two years would expire, and therefore required him to make his choice; but he refused; whereupon he chose forty of the best himself, and left them standing, and took the rest. . . . The vendee . . . had no property till election or default made by the vendor, which was supplied and made certain by the vendee; and yet the vendee could not have made the choice in default of the vendor, till the time incurred so near, that he must needs, and that must be put upon judgment of the jury or court." *Stukeley* v. *Butler*, Hob. 168, 174; *Palmer's Case*, 5 Co. 24.

That is sufficiently certain which can reasonably be made certain. Broom Max. 481. A grant, reservation, or devise of "all mill sites in Lot 4," or of one "in any part of the lot," would be valid. *Thompson* v. *Gregory*, 4 Johns. 81; *Vandenburgh* v. *Van Bergen*, 13 Johns. 212; *Valkenburgh* v. *Van Buren*, 13 Johns. 525; *Jackson* v. *May*, 16 Johns. 184, 185; *Jackson* v. *Vermilyea*, 6 Cow. 677, 679, 680; *Provost* v. *Calder*, 2 Wend. 517, 523–525; *Dygert* v. *Matthews*, 11 Wend. 35–37. The proposition that an unexercised right of location is too indefinite to support an action of ejectment (*Jackson* v. *May*, 16 Johns. 184, 185) does not deny the right, but merely points out a defect in a form of action. A sheriff's inability to deliver possession of certain interests in land does not prevent their being ascertained and established by legal proceedings. A judgment determining the question of right is conclusive without service of process for its enforcement. *Walker* v. *Walker*, 63 N. H. 321, 327. The rule, that grants, reservations, and devises, reducible to certainty by such means as the law appoints, are not void for uncertainty, is not rendered inoperative by an obsolete system of deficient procedure.

*Butcher* v. *Creel*, 9 Grat. 201, was an action of ejectment. A grantor had reserved the right to build a sawmill on an acre at a described end of a dam. "There is," said the majority of the court, "no such certainty in the description of the part intended to be excepted as to withdraw it from the operation of the deed: it is in no wise identified or distinguished from other portions of the acre. If it might be identified by entry and taking possession of so much of the land as might be necessary for the sawmill about to be erected, yet, as no such entry has been made or possession taken, a recovery cannot be had by the plaintiff." In our procedure, these objections would be unavailing. If the parties contested the existence of an unexercised right to build a sawmill and use land necessary for carrying on the business of the mill, the controversy could be determined in a real action. If the location and extent of the mill lot were in dispute, it could be laid out and set off on a bill in equity filed as an amendment of the pleadings in the action at law. Each party would be entitled to the means reasonably necessary to accomplish the

objects of the grant and the reservation. *Boody* v. *Watson,* 64 N. H. 162, 177. Wrong would not be done through a failure of the law to provide the means required by justice for reducing the reserved right to certainty.

In *Darling* v. *Crowell,* 6 N. H. 421, the plaintiff, owning land on which was a mill worked by a river, had conveyed to W., under whom the defendant claimed, a tract of fifty acres, a portion of which was flowed by the plaintiff's dam. The deed contained this clause : " excepting one acre, and one half acre, which is reserved for the use and flowing of water for the mill." This was held void for uncertainty (*p.* 425), on the ground that " How much of the land it might be advisable to retain for the use of the mill, or how much for purposes of flowing, or where in such case it would be located, it is impossible to tell, and the grantor cannot elect." A literal construction of the exception would make " use " and " flowing " synonymous, and give the plaintiff, on the fifty acres, a mill-pond of an acre and a half, located by measurement between the edge of the water (in its natural condition) and a higher level. If this or some other reasonable construction were not satisfactory to both parties, justice could be done on a bill in equity (for a reformation of the deed) filed as an original petition, or as an amendment of a declaration or plea. *McShane* v. *Main,* 62 N. H. 4, 7, 8. Whatever else their intention might have been, it is not to be supposed that they intended the reservation should be wholly inoperative. *Bell* v. *Morse,* 6 N. H. 205, 209. Their understanding of it was determinable, not by rules of law, but by the balance of probabilities found in the competent evidence tending to prove the fact of intention. *Houghton* v. *Pattee,* 58 N. H. 326; *Morse* v. *Morse,* 58 N. H. 391; *Corwin* v. *Hood,* 58 N. H. 401; *McShane* v. *Main,* 62 N. H. 4, 7; *Keysar* v. *Covell,* 62 N. H. 283, 284; *Whittier* v. *Winkley,* 62 N. H. 338, 340; *Hurd* v. *Dunsmore,* 63 N. H. 171; *Crawford* v. *Parsons,* 63 N. H. 438; *Johnson* v. *Conant,* 64 N. H. 109, 136.

" We ought not, without absolute necessity, to let ourselves embrace the alternative of holding a devise void for uncertainty. . . . If there be ever so little reason in favor of one construction of a devise rather than any other, we are, at least, sure that this is nearer the intention of the testator than that the whole should be void. . . . The difficulty of arriving at a conclusion, even the grave doubt which may hang around it, . . . form no ground whatever of holding a devise void for uncertainty. The difficulty must be so great that it amounts to an impossibility; the doubt so great that there is not even an inclination of the scales one way. . . . The books are full of cases where every shift, if I may so speak, has been resorted to, rather than hold the gift void for uncertainty." Lord *Brougham* in *Winter* v. *Perratt,* 6 M. & G. 314, 359, 361, 362; *Harriman* v. *Harriman,* 59 N. H. 135, 136.

The validity of a provision of a deed, like the validity of a devise, does not depend upon the absence of all ambiguity. When its meaning is not reasonably and morally certain, the contract is not altered for that reason. However inconclusive the evidence, it is to be weighed. However doubtful the intention, a preponderance of probability is enough to establish it. In *Newsom* v. *Pryor*, 7 Wheat. 7, 10, a part of a boundary line was described as running "south 894 poles, to a stake, crossing the river." To cross the river the number of poles must have been 1,222. The validity of the grant was not affected by the uncertainty of location. The distance was controlled by the natural monument, because "it is much more probable that" the surveyor "should err in the distance, than in the fact of crossing the river." There is a natural inference that a reservation of an acre and a half of land "for the use and flowing of water for the mill" was designed to retain a title or right reducible to certainty by such means as the law appoints. Whether the more probable intent was to reserve the land for a mill-yard and pond, or solely for a pond, the parties must have contemplated a right of location capable of adjustment and enforcement by legal process. They could not have understood that the reservation would be erased by a judicial inability to carry it into effect. Nothing less than an insuperable difficulty could nullify it and give the grantee a piece of the grantor's land, which it is certain the grantee did not buy or pay for, and which was certainly not understood by either party to be a gift.

In *Gardner* v. *Webster*, 64 N. H. 520, the defendant conveyed land to the plaintiff's grantor, "reserving the right to pass and repass" across it. The court say: "On the question whether a granted way is subject to gates and bars, their necessity or convenience to the grantor and inconvenience to the grantee may be considered. In this case there is no explicit provision on the subject, and it being found that gates and bars are reasonably necessary, the plaintiff is entitled to maintain them. . . . The location and limits of the reserved way are not specified. It is a reservation of a reasonably convenient and suitable way. . . . The convenience of both parties is evidence of the locality of the defendant's way. . . . Its route . . . is determined not by the sole interest of either of the parties, but by the reasonable convenience of both. If its location were contested, the controversy might not be settled by the . . . result of many actions at law. Both parties, or either of them, might need a decree in equity that would fix the route." Under an abutter's right to a reasonable use of the basin of a public water, the quantity as well as the location of a site for a wharf, warehouse, weir, or tide-mill is determinable on a bill in equity. *Concord Co.* v. *Robertson*, 66 N. H. 1, 19, 20. The principle that furnishes the means

of measuring and locating reasonably convenient ways, and reasonable sites for wharves, warehouses, weirs, and tide-mills, and reduces them to certainty by laying them out, would not allow a right to an acre and a half of mill-yard and mill-pond (in *Darling* v. *Crowell*) to fail for want of a method of settling the question of reasonably convenient location.

*Darling* v. *Crowell* is one of the cases in which courts have been influenced by Shep. Touch. 79, where it is said: "If the exception be set down uncertainly, as if one grant a house, excepting one chamber; or grant a manor, excepting one acre; but doth not set forth which chamber or which acre it shall be; these exceptions are void." Taken without qualification, this passage rejects the ancient doctrine of election, the maxim that things reducible to certainty by legal measures are sufficiently certain, and the presumed intent of the parties that their contract shall not be violated with impunity if it can be enforced by a reasonable appeal to the resources of the law. When a grant or reservation of an interest in land is held void for uncertainty, it is morally certain that injustice is done. An equitable result is generally reached if due effort is made to ascertain the fact of intention by balancing probabilities, and to determine the granted or reserved right by authorized procedure.

Whether the title of personal property passes when a contract of sale is made, or remains in the vendor till something more is done, is often a question of intent for a jury. *Fuller* v. *Bean*, 34 N. H. 290, 302–305. At common law, when a certain amount of personality is sold, to be taken out of a specific mass, the title passes at once before severance or identification, if such is the intent; and this intent is inferred from a delivery of the whole mass to the buyer with power to make the separation. 1 Benj. Sales (Am. ed., 1884), ss. 315–317, 477; *Page* v. *Carpenter*, 10 N. H. 77, 80; *Bailey* v. *Smith*, 43 N. H. 141, 143; *Crofoot* v. *Bennett*, 2 N. Y. 258, 260. A constructive delivery of the whole is sufficient, even if the mass is of such diverse qualities that the separation requires a degree of skill and judgment. *Lamprey* v. *Sargent*, 58 N. H. 241, 242. A delivery showing a simultaneous transfer of title, is not wanting in a conveyance of land by its owner. His delivery of the deed is a delivery of the property. *Bell* v *Peabody*, 63 N. H. 233, 239; Tied. R. P., ss. 693, 695.

In 1844 it was considered an open question whether a conveyance of an unlocated half of a specified lot, describing the granted premises as half in value, could be made certain by legal process of partition. "Whether a conveyance by the owner of the whole lot, of the south half of it in quantity and quality, would operate as a conveyance of one half in quantity only, on account of the uncertainty which would otherwise exist respecting the dividing line until settled by agreement of the parties, or whether

some proceeding might be had in such case to settle the line of separation in case the parties failed to agree, we need not now determine. The deed . . . which contained that description . . . undoubtedly conveyed an estate. . . . The only question which could arise was, where the dividing line should be located." *Smith* v. *Powers*, 15 N. H. 546, 562. The best inventible procedure must be capable of solving the question of value in such a case, and an appraisal must be a means of certainty where the common law provides convenient modes of ascertaining the value of land.

" Excepting four rows of apple trees on the north side of the orchard, and the land on which they stand " (*Randall* v. *Randall*, 59 Me. 338), is a description that might require a location to be made by legal process. Conveyances of "a mill-yard, one hundred feet square, adjoining said mill . . . best to accommodate said . . . mill " (*Farrar* v. *Cooper*, 34 Me. 394, 398), " also one half of an acre of land near the wharf or at the wharf "(*Simpson* v. *Blaisdell*, 85 Me. 199), are valid. In 1793, " for the sum of five shillings, but more especially for the encouragement of building a bridge over the Piscataqua river at and from Fox Point," Richard Downing conveyed to the proprietors of Piscataqua bridge " one acre, to be laid out in square form, upon any part of my farm at Fox Point . . . where said proprietors may think proper to build said bridge." Landmarks in Dover 75. If the phrase " where said proprietors may think proper to build said bridge " had been omitted, there would have been sufficient evidence that the grantees could select an acre in a square form, on Fox Point, at the end of their bridge.

It is not necessary in this case to consider the soundness of the rule that a tax collector, selling a part of a lot of land for taxes, cannot give an election to the purchaser. One of the reasons given for this rule is, that the purchaser could not be compelled to elect in a reasonable time, there would be no remedy for his refusal to elect, and the want of remedy might be an intolerable inconvenience to the owner of the rest of the lot. *Haven* v. *Cram*, 1 N. H. 93, 95. This view, as we have seen in the case of non-official conveyances, is erroneous. If there is a sufficient reason for holding that a tax collector cannot give an election to his grantee, the question would be of the soundness of the Vermont rule, that in a collector's deed of a part, described as " thirty-six acres of said lot," the description means " an undivided interest in the lot in the proportion that thirty-six acres bears to the whole number of acres in the lot." *Sheafe* v. *Wait*, 30 Vt. 735. " If we regard the rules that control the exposition of deeds," say the court in that case, " we can have no doubt on this point. It must have been the intent of the parties. If we accept a contrary construction, the sale and deed would be void ; and the rule is,

that deeds should be construed so as to be upheld rather than avoided."

When the rules that control the exposition of deeds were disregarded in tax cases, and the law was perverted by strained and quibbling interpretation in behalf of tax-payers endeavoring to throw their share of the common burden upon their neighbors (*Boody* v. *Watson*, 64 N. H. 162, 179), such a deed as was upheld in *Sheafe* v. *Wait* could be held void for uncertainty. During that period, the construction of tax deeds was understood to be exceptional. A distinction was expressly made between them and other conveyances. While a collector's deed of " 250 acres," " part of lot No. 300 " (which contained about 400 acres), was held to be void for uncertainty, it was not doubted that the same deed would have been valid if made by the owner of the lot." *Haven* v. *Cram*, 1 N. H. 93. " The deed of the constable is clearly void for uncertainty, unless it can be construed to be a grant of 250 acres to be located by the grantee at his election. In a common conveyance from one individual to another, the court would be warranted in putting such a construction upon the deed (Bac. Abr., Grant H, 3), because every deed is to be construed most favorably to the grantee; and therefore to give effect to the conveyance, the deed is construed to give an election in such a case to the grantee to locate the land." *Ib., p.* 94. If it were necessary to give him an election in order " to give effect to the conveyance," that construction would be adopted. But there is another alternative, and it may be doubtful whether the grantee in *Haven* v. *Cram* would have had an election if the owner of the lot had been the grantor. " Tenancy in common " was " often expressed, in early times, by a certain number of acres." Smith (N. H.) 519, 516, note.

In *Stevens* v. *Johnson*, 55 N. H. 405, the majority of the court held that when the owner of a lot conveys a part of it with such a description as was given in the collectors' deeds in *Haven* v. *Cram* and *Sheafe* v. *Wait*, the grantee has an election, and that he can elect a tenancy in common; while the minority was of opinion that the deed creates that tenancy. It was unanimously decided that a deed made by a person not acting in an official capacity, conveying premises described merely as 100 acres, part of the lot, is not void for uncertainty. If the question were new, there would be no doubt or difficulty. The maxim, *Verba debent intelligi cum effectu, ut res magis valeat quam pereat* (2 Bl. Com. 380; Bac. Max., reg. 3; Co. Lit. 36 a; *Throckmerton* v. *Tracy*, Plow. 145, 156), is a statement of the duty of making reasonable efforts to give effect to the intent and understanding which written instruments are meant to express. An intent of contracting parties that their grants or reservations shall be void for uncertainty, and their understanding that they are void for that cause, cannot

be assumed. The natural inference of fact is, that they are designed to be valid, and that the intent will be frustrated if they are held void for uncertainty. Whether holders of tax titles are or are not deprived of the equal protection of the laws, and whether there are or are not exceptional cases in which the rule of *magis valeat* can properly be reversed, or in which a stipulation can be unnecessarily held to be void, we need not now inquire. An owner's grant or reservation of land described only as an acre, being a part of a described lot, is not an exception to the rule that the words are to be understood *cum effectu*, in order that the transaction (including all its parts) may be operative rather than void. The question in such a case is, not whether the grant or reservation is void, but whether the owner of the acre, being made a tenant in common by the delivery of the deed, has or has not a right of election. Unnecessary invalidity would be contrary to elementary principle.

Tenancy in common, existing until partition is made by an exercise of a right of election (or otherwise), is regarded by the law with no disfavor. By a single deed, an owner of a farm conveyed it to three of his children, Richard, Abigail, and Job,— " 24 acres of land " to Richard " to be in common and undivided; 6 acres " to Abigail " to be in common and undivided; and the remainder of said farm, with the buildings," to Job. After the death of the grantor, one of his other children contended that the deed was void for uncertainty. "It seems clear," say the court, "that the grantor intended to convey, 'in the buildings,' a several estate to Job. . . . It is not improbable, therefore, that the grantor may have expected " the three shares of the rest of the farm would be held "in common and undivided." "As the whole farm contained 104 acres, the difficulty in ascertaining the proportion of each grantee would not be insuperable. Excluding the buildings, the proportion of Richard in the land would be $\frac{24}{104}$, that of Abigail $\frac{6}{104}$, and that of Job $\frac{74}{104}$. . . . If the farm was found to contain a larger or less quantity of land, the proportions would remain in the same ratio. . . . Were it necessary, for the purpose of making the deed operative, to resort to a different construction, it would not be a very forced one to pass by the deed a several estate to each of the grantees,"— to Richard " ' 24 acres of land . . . to be in common and undivided ' till it was elected in which part of the farm to make the location of it; '6 acres to Abigail' in a similar manner; and the 'remainder of the farm, with the buildings, to Job.' " *Canning* v. *Pinkham*, 1 N. H. 353, 355, 356.

A grocer having sold his store, No. 9 Main street, his goods, and the good-will of his business, and covenanted not to open another grocery " in the immediate vicinity " of No. 9, opens another in No. 10 of the same block, and contends that as No. 10 is cotermi-

nous with No. 9 he has not broken his covenant,— the answer is, that the object of the covenant was to prevent competition, and that on his construction, this object would not be accomplished. The purpose of the covenant is conclusive evidence that the parties understood adjoining stores would be " in the immediate vicinity " of each other. In some connections the phrase may include, in others it may exclude, actual contact. Its meaning may depend upon a scheme indicated in the context. Any word or phrase of a stipulation capable of two meanings is to be so read, if it reasonably may be, as not to baffle or embarrass the plan of the clause in which it occurs. In Cross's reservation, the purpose of retaining a mill privilege is satisfactory evidence that the parties understood " the immediate vicinity " did not exclude the greatest degree of proximity, and that the east end of the dam might adjoin the measured acre, or stand upon it. The interposition, between the dam and the acre, of a strip of land across which the owner of the dam and the acre could not dig a canal or build a flume, would be inconsistent with the apparent design of a manufacturing plant. It is not probable that the parties intended to forbid the junction of parts of the reserved estate, or thought of prohibiting unity by requiring " immediate vicinity." That phrase is a limitation of the uncertainty arising from an unexecuted power of election. An exercise of the power is the means provided for the removal of the limited uncertainty.

The reserved " piece of land fronting on said river . . . twelve rods in length on the bank of said river, and extending back far enough, same width, to comprise one acre," is an acre on the east side of the water's edge, and the east half of the bed of the river in front of it. The west half of the dam will be on the plaintiffs' land; and in this inquiry it is assumed that the east half will be on the reserved tract which contains more than an acre, but which, being in a legal sense the reserved acre, may properly be called the acre. If the plaintiffs should build, or propose to build, the east half of the dam on the defendant's land, questions might be raised which there is now no occasion to consider. A judgment in favor of the plaintiffs for the measured acre, bounded on the west (as it is bounded in the declaration) by the low-water line of the river, will establish their title to the east half of the bed of the stream in front of that acre. An executed writ of possession, describing the premises as they are described in the declaration, will give them possession of the half of the bed which in legal effect is a part of their acre.

IV. On the question whether Cross's reserved " right of building a dam . . . together with the right of flowage " was more than a life estate, the defendant takes this position : Although the word " heirs " is not necessary in a New Hampshire

grant of a fee, the decision in *Cole* v. *Lake Co.*, 54 N. H. 242, leaves deeds and wills on the same common-law footing: a conveyance or reservation of a fee must contain such an expression of the idea of perpetuity as the common law requires in a devise of a fee: the clause relating to Cross's right to build a dam, and his right of flowage, is a reservation and not an exception.

" Reserving," " excepting," and " excluding" are generally used as synonyms. Whether a provision is a reservation or an exception does not depend upon the use of a particular word, " but upon the nature and effect of the provision itself." *Stockwell* v. *Couillard*, 129 Mass. 231, 233; *Fischer* v. *Laack*, 76 Wis. 313, 319, 320; *Keeler* v. *Wood*, 30 Vt. 242, 246; *Chicago, etc., Railway* v. *Railroad*, 143 U. S. 596, 599, 613, 614. "A clause of reservation is construed to be an exception, if that will best effect the intent of the parties." *Bowen* v. *Conner*, 6 Cush. 132, 135; *Pettee* v. *Hawes*, 13 Pick. 323, 326, 327.

If Cross were now living, and had parted with no interest in what he reserved or in the west section, he could make the location that has been made by the plaintiffs, and could build a dam on the west section and the acre. His undivided tract of land extending from the east side of the acre to the west side of the west section, would include the whole bed of the river in front of the measured acre, and the west half of the rest of it in Lot 4. By flowing that tract he would not exercise his reserved "right of flowage." The only easement he would have would be the reserved right of flowing the part of the east section not belonging to him; and that easement would be an appurtenance of his land. *Watson* v. *Bartlett*, 62 N. H. 447, 450; *Borst* v. *Empie*, 5 N. Y. 33, 39; *Winthrop* v. *Fairbanks*, 41 Me. 307, 311-313; *Smith* v. *Ladd*, 41 Me. 314, 319, 320. The right of flowing the land conveyed to Wilson being reserved for the benefit of land retained by the grantor (the acre and the west section), and being, for that reason, annexed to the grantor's land as an appurtenance, the easement is perpetual. Wash. Ease. *21; *Parker* v. *Nightingale*, 6 Allen 341, 347; *McMahon* v. *Williams*, 79 Ala. 288, 291. Even if the word " heirs" were required by New Hampshire law in the conveyance of a fee, the easement retained by Cross for the benefit of land which he continued to hold would be a perpetual estate, although not expressly reserved "to myself and my heirs." *Chappell* v. *Railroad*, 62 Conn. 195, 202-207. The acre remained his in fee. His title to it, like his title to the west section, was not reduced to a life estate by his sale of an interest in adjoining land. Wilson took the east section, less the acre, subject to a flowage easement. In other words, he took the east section less the acre and also less the easement. Cross's right to flow the servient tenement, severed from it and annexed to the dominant tenement (situated on both sides of the thread of the

river), did not lose the perpetuity belonging to it as a part of the retained mill privilege. In common speech, the retained privilege on the east side, dominant and appurtenant — the acre and the flowage right,— was not conveyed. In technical parlance, it was not reserved, but excepted.

By a feudal rule, Cross's retention of an easement in the east section would have been a reservation if the easement had not been retained as an appurtenance of his land. "Reserving . . . the right of building a dam . . . together with the right of flowage, . . . also reserving a piece of land . . . one acre," is a form of expression indicating that the parties did not intend a part of this property should be reserved and the rest excepted, but did intend that the whole should be one estate of uniform duration, and part of a mill privilege of the same duration. The deed being their lawful understanding, proved by competent evidence and not by rules of construction, the distinction between a reservation and an exception is useless in this case. Cross's reserved estate in the acre was the fee, not because as a matter of law his retention of the acre was an exception and not a reservation, but because the deed, understood in the ordinary and popular sense of its terms, does not divide the title into a life estate and a remainder, but is silent on that subject; and as a matter of fact, the deed, containing no allusion to a division of that kind, is convincing evidence that the grantor and grantee intended the grantor should keep the described "piece of land," which the deed says he reserved, and not a mere life estate of which the deed makes no mention. In the ordinary and popular sense in which they used the word, "reserving" is "keeping"; and keeping his own land was keeping the whole of his title. His right of flowing the land he conveyed to Wilson was retained as a part of his mill privilege and an appurtenance of land of which he kept the fee. If he had meant to impair the value of his mill privilege by reducing such a part of it to a life estate, it is not probable that a clear and express statement of so singular a transaction would have been left out of the deed. If he had reserved the acre "for and during the term of my natural life" only, this would have been evidence on the question whether his right of flowing the east section above the acre was intended to be reduced to a life estate. There might be some ground for arguing that the term of the easement on the east side was probably not meant to be longer than the term of the east part of the dominant tenement.

Until Cross delivered the deed, the bed of the river and the undivided mill privilege were a part of his land. He could have stipulated that if he built a mill on the acre, and a dam on the acre and the west section, and died as soon as he completed the investment, the mill lot (including the mill, the measured acre,

half of the adjoining bed of the river, the east half of the dam, and half, or other portion, or the whole of the water power) should be the property of Wilson, and the owner of the west section should have no right to flow any part of the east section. It is possible that the owner of an unimproved mill privilege has reduced his perpetual rights of use and occupation to a tenancy for his life, with a design of constructing a manufacturing establishment which would not go to his heirs or devisees at his death, and in which he could sell only his precarious life estate, or with a design of selling a right to make an investment of that kind. Such a division of the title might not conclusively prove his need of a guardian. The grantee of the remainder might have entertained views that led him to indemnify the grantor for the damage done by breaking up the fee. For some purpose, the grantee might have desired to prevent the improvement of the mill privilege during the life of the grantor, and been willing to pay for the postponement of its use. The field of conjecture is boundless. But when an apparently wasteful disposition of property is not made in express terms, and the intent of contracting parties is to be inferred as a fact from competent evidence, and the evidence is a mere grant and reservation of realty, the tribunal cannot reject probability, and assume that the intent was whimsical or extraordinary.

Understood in a peculiar sense, " reserving " would import the technical theory that Cross conveyed to Wilson the whole of the east section except the acre, and at the same time took back a right of flowage by an implied grant from Wilson. " A reservation is always of something taken back out of that which is clearly granted ; while an exception is of some part of the estate not granted at all." *Craig* v. *Wells*, 11 N. Y. 315, 321. " A right of way reserved . . . is, in strictness of law, an easement newly created by way of grant from the grantee." *Durham, etc., Railway* v. *Walker*, 2 A. & E. N. S. 940, 967. " The part excepted is already in existence, and is said to remain in the grantor. The grant has no effect upon it. A reservation is the creation, in behalf of the grantor, of some new right issuing out of the thing granted, something which did not exist, as an independent right, before the grant. . . . A reservation is in the nature of a grant to the grantor, and therefore requires the same words of limitation as in the direct grant to the grantee. But an exception requires no words of limitation." Tied. R. P., s. 843. By this rule, applied without regard to the appurtenant character of the reserved right, Cross retained his fee in the acre because he did not convey it to Wilson, but he retained only a life estate in " the right of flowage " because he conveyed that right to Wilson, and did not reserve it " to myself and my heirs " as he must have done to acquire a perpetual right by the implied reconveyance.

"Property is the right of any person to possess, use, enjoy, and dispose of a thing. The term, although frequently applied to the thing itself, in strictness means only the rights of the owner in relation to it." *Selden*, J., in *Wynehamer* v. *People*, 13 N. Y. 378, 433. The most absolute land title is a perpetual right of exclusive occupation and perpetual rights of use. *Lumber Co.* v. *Company*, 65 N. H. 290, 391, 392. By considering the fee as dissolved into the legal rights of which it consists, a view is obtained of the fictitious character of the process which conveys to Wilson one of Cross's reserved rights, and takes it back by a reservation construed as a reconveyance. In Connecticut, under the feudal rule requiring the word "heirs" in the conveyance of a fee, a deed containing a provision that "we [the grantors] reserve to ourselves the privilege of crossing and recrossing" the granted premises raised the question whether the reserved easement was more than a life estate. "The right to cross was, in a certain sense, a right existing in the grantors at the date of the deed. It was a part of their full dominion over the strip about to be conveyed by the deed, and not a right to be, in effect, conferred upon them by the grantees. It was something which the 'reservation' in effect 'excepted' out of the operation of the grant." *Chappell* v. *Railroad*, 62 Conn. 195, 204.

As the reservation in this case does not appear to have been written in a peculiar sense, it is to be taken in its ordinary, natural, and popular signification, which is, that after the conveyance Cross was to have no right that he did not have before. This popular sense is the legal sense, not because an artificial rule has been established by judicial or legislative power, but because the law ascertains the facts of the case and acts upon them; and a peculiar meaning not being proved, the inference of fact is, that Cross and Wilson understood the reservation in a sense that is not peculiar — the ordinary sense in which it would be understood by people in general. Thus understood, it describes proprietary rights that did not pass from the grantor, and consequently is a part of the description of those that did pass. The deed is a mere conveyance from Cross to Wilson, and not a conveyance in that direction supplemented by an implied reconveyance. Reading it in a peculiar sense, it can be made to express an intent to take one of Cross's rights from him, give it a new technical name, and revest it in him as a new and less durable right, by imaginary grants to and°fro between him and Wilson. There is no reason to believe that this superfluous project of nominal creation was in their minds. The law does not resort to fictions without a motive, or for any other purpose than a compliance with the requirements of justice. 3 Bl. Com. 43, 206; Broom Max. 90; Lang. Sum. Cont. 115; *Aslin* v. *Parkin*, 2 Burr. 665, 668, 669; *Johnson* v. *Smith*, 2 Burr. 950, 962; *Mor-*

*ris* v. *Pugh*, 3 Burr. 1241, 1243; *Low* v. *Little*, 17 Johns. 346, 348; *Gibson* v. *Chouteau*, 13 Wall. 92, 101; *Newhall* v. *Sanger*, 92 U. S. 761, 766. A contract may be implied by law contrary to the fact, as a mode of enforcing the performance of a legal duty. *Sceva* v. *True*, 53 N. H. 627; *Kelley* v. *Davis*, 49 N. H. 187. In ejectment, a fictitious lease has been adopted as a just and convenient form of procedure. Whatever equitable use may be made of grants which Cross and Wilson did not make, and which exist only in the imagination of an interpreter, they cannot operate inequitably without a repeal of the maxim that a legal fiction injures no one. They do not alter the grant that was made. They do not unjustly abridge a right retained by the grantor.

Cross's right to flow the east section above the acre was in existence before the deed was made. It was perpetual before he conveyed a part of that section; and in the popular meaning of "reserving," what he reserved he did not convey, and what he did not convey remained his in continuation of his former title. There was but one conveying contract. The reservation, negatively describing the granted premises, explains and qualifies the grant, and is a part of it. The grant, thus explained and qualified, divided the title, left a part in Cross, and transferred the rest to Wilson. Cross's right to flow the east section above the acre became a right to flow Wilson's land. Its substance was the same after the conveyance as before. Before the conveyance, it was one of the rights of which the undivided title was composed; afterwards it was an easement. For some purposes the change in its technical name may be called a creation of a right; but the change is not material in this case. The deed does not express an intent to change the duration of Cross's interest in any part of the reserved property.

If technicality and figment, instead of the intent of the parties, were adopted as the ground of decision, the perpetual right of flowing the east section above the acre, which had belonged to Cross, could be cut down to a life estate. A legal fiction could transfer it from Cross to Wilson, and transfer back to Cross a life estate in it. Two deeds could be made for them without their consent or knowledge. By holding, contrary to their understanding, that the reservation was a grant from the grantee to the grantor, a conveyance from Wilson to Cross could be invented, and an opportunity could be gained to put in operation the rule requiring the word "heirs" in the grant of a fee. Applying this rule to the fictitious conveyance, Cross could be wrongfully deprived of a portion of his property. Consistency would deal with the rest of the reservation in the same circuitous and violent manner. As the grantor did not reserve anything to his heirs in the terms required by the feudal rule, an implied

reconveyance, construed by that rule, would make Cross a tenant for life of the acre as well as the easement. If the deed conveyed the flowage to Wilson, it also conveyed the acre. An imaginary reconveyance is no more necessary for one than for the other. The competent evidence has no more tendency to show a life estate in the easement and a fee in the acre, than to show a fee in the easement and a life estate in the acre. Estates of different durations in the reserved property can only be established by inserting in the contract a technical distinction between a reservation and an exception, which the written evidence distinctly rejects, and assuming that the parties relied upon their meaning being disclosed by some form of a feudal rule of which there is no reason to suppose they had any knowledge.

V. " The intention of the testator fails on account of a feudal rule of law, which, in my humble judgment, ought to have been abolished long ago. I mean the rule of law requiring that, in order to support a contingent remainder, there must be an estate of freehold in existence at the time the contingent remainder becomes vested. . . . This is an arbitrary feudal rule, one of the legacies of the Middle Ages which has come down to our times. . . . It is quite true that the testator probably never heard of this rule of law, but I think his conveyancer did who drew the will, for it is a will drawn by a lawyer, and the conveyancer made a mistake." *Jessel*, M. R., in *Cunliffe* v. *Brancker*, 3 Ch. D. 393, 399, 401. Aside from obsolete difficulties of procedure, the only reason of the rule requiring a contingent remainder to be supported by a freehold is said to be, that if the freehold were in abeyance the feudal lord would be at a loss to know upon whom to call for feudal service. 4 Kent 237 ; *Taylor* v. *Horde*, 1 Burr. 60, 107.

" The introduction of the feudal law into England by William the Conqueror had much infringed the liberties, however imperfect, enjoyed by the Anglo-Saxons in their ancient government, and had reduced the whole people to a state of vassalage under the king or barons, and even the greater part of them to a state of real slavery. . . . The feudal law is the chief foundation both of the political government and of the jurisprudence established by the Normans in England " 1 Hume Hist. Eng., c. 11, p. 423, and App. 441, 444–446. " The military tenure of land had been originally created as a means of national defence; but in the course of ages whatever was useful in the institution had disappeared, and nothing was left but ceremonies and grievances." 1 Macaulay Hist. Eng., c. 2; 4 Bl. Com. 438.

" The rules concerning real property, and to a considerable extent those concerning personal *status* and relations, were feudal in their origin and nature." 1 Pom. Eq. Jur., s. 18. " The feudal system in its day made serfs of masses of men. . . . It was

inimical to peaceful pursuits. Out of its logic sprang the most baneful doctrine that has blighted the English law,—the doctrine of tenure. To gratify ancestral pride and maintain family splendor, the feudal aristocracy tied up landed property in the iron fetters of tenure. . . . The feudal system is the principal source of the land laws of Great Britain, which still press with such weight upon the agricultural and industrial classes. . . . Having done its work, feudalism is happily gone. . . . Largely, the curse of the common law came from the feudal system, and from the obstinacy with which the doctrines of feudalism were adhered to, when the system . . . had ceased to exist. . . . Our real property law is still poisoned by the feudal taint." Dill. Laws of Eng. and Am. 169, 170, 302–304, 355, 356, 385.

" If a man purchases lands to himself forever, or to him.and to his assigns forever, he takes but an estate for life. Though the intent of the parties be ever so clearly expressed in the deed, a fee cannot pass without the word ' heirs.' The rule was founded originally on principles of feudal policy, which no longer exist, and it has now become entirely technical. A feudal grant was, *stricti juris*, made in consideration of the personal abilities of the feudatory, and his competency to render military service ; and it was consequently confined to the life of the donee, unless there was an express provision that it should go to his heirs." 4 Kent 6. " Common sense would have dictated that an absolute estate should pass by a conveyance without any limitation. . . . Maxims of law which grow out of the feudal system are, in general, inapplicable in this country." Smith (N. H.) 452, 523. It must be considered settled that such inconvenient and unjust rules as are based solely on feudal reasons, and are not adapted to the land system of this state, are not in force here.

" Unless the lord bound himself that the fief should go to the heir of his vassal, the heir had no rights in it on the death of his ancestor. . . . The rule was nothing more nor less than the practice of the feudal sovereign, securing and perpetuating his grasp upon all the land and the services of all the landholders in his realm. Its origin, purpose, and history show it to be in no way adapted to our institutions, system of government, or condition of society. As a feudal rule of construction, it was a recognition of the fact that the vassal held his lord's land upon the condition of rendering in his own person certain services to his lord. The vassal, thus holding the land by reason of the personal trust and confidence reposed in him by his lord, could not assign, nor could his heirs inherit, his obligation of personal service on the land held on such a condition. The feudal rule is inapplicable to a conveyance of New Hampshire land not held by any such tenure. When the fetters which feudalism had fastened upon the tenure of lands in England fell off, every reason on which this rule

had rested fell with them. . . . An act of parliament cannot alter by reason of time; but the common law may, since *cessante ratione cessat lex.* . . . They who brought the general body of the common law with them to this region might well have omitted to bring the feudal rule, not because it was fabricated in a barbaric age, but because it was designed and fitted to perpetuate a barbaric condition; . . . not because, as a part of the military system of Europe, it was less necessary in feudal times than other compulsory methods of filling armies and navies in other times, but because the general feudal relation of lord and vassal not being an incident of New Hampshire civilization, and the particular debt of personal service due from the vassal to the lord (which the heirs of the vassal might be incompetent to perform) not being a universal consideration of the conveyance of New Hampshire real estate, the feudal rule (requiring the word ' heirs ' as evidence of the lord's intention to assume the risk of his vassal's heirs being incapable of the stipulated service) was inapplicable to the situation and circumstances of the emigrants, and implied a servitude inconsistent with the principles of personal freedom and equality which pervaded their social and political plan, hostile to the general object of their emigration, and particularly subversive of that absolute ownership of the soil which they specially sought in the New World. . . . The rule, which would defeat the obvious intention and destroy the plainly expressed contract of the parties, . . . is not adapted to our institutions, or the conditions of things in this state; . . . it never became part of the law of the state." *Cole* v. *Lake Co.*, 54 N. H. 242, 285, 286, 290.

In England, the rule " is now softened by many exceptions. . . . It does not extend to devises by will; in which, as they were introduced at the time when the feudal rigor was apace wearing out, a more liberal construction is allowed : and therefore by a devise to a man forever, or to one and his assigns forever, or to one in fee simple, the devisee hath an estate of inheritance ; for the intention of the devisor is sufficiently plain from the words of perpetuity annexed, though he hath omitted the legal words of inheritance. But if the devise be to a man and his assigns, without annexing words of perpetuity, there the devisee shall take only an estate for life; for it does not appear that the devisor intended any more." 2 Bl. Com. 108. In a note to this passage, Chitty says, of the softened form of the feudal rule applied to wills, " Lord Coke teaches us (1 Inst. 322 b) that it was the maxim of the common law, and not, as has been sometimes said (*Idle* v. *Cook*, 1 P. Wms. 70, 77, 78), a principle arising out of the wording of the statutes of wills." " Although a set form of words, and the word *heirs* particularly, are necessary in deeds to convey an inheritance, yet may they be dispensed with in last

wills, at which time it is presumed that the testator is *inops con-silii;* hence great regard is paid to the intention of the testator." Bac. Abr., Devises (C). This seems to be an intimation that the intent of testators is entitled to more regard than the intent of grantors and grantees. By whomever and under whatever circumstances deeds and wills have been usually drawn in England, the different degrees of skill employed in drafting such instruments in this state do not sustain a general or special rule for finding a life estate in words of a deed which would prove a fee if the grantor had used them in his will. As understood by the entire population of the state, with trifling if any exceptions, without the aid of a statute of interpretation, "I give my farm to A B" are words of perpetuity in a will, and "I sell my farm to A B" are words of perpetuity in a deed. They may be qualified by other words in the same instrument. When they are used without qualification, an intent to dispose of the whole of the devisor's or grantor's interest in the farm is plainly and adequately expressed.

Under feudal usages and feudal traditions, and systems of tenure and entail in which the largest title was in effect a life estate, the construction of deeds and wills has been obstructed and deflected by a rule against an intent to grant, reserve, or devise an estate of inheritance. In the case of deeds, the rule took a more absolute form than in the case of wills. There was a difference in the amounts of wrong done by its two forms; but the operation of its softened form was purely destructive. When a testator devised to N. a described tract of land, and to "my loving wife" "all the rest of my lands, tenements, and hereditaments," the feudal hostility to estates of inheritance, surviving in a so-called rule of law, was strong enough to mutilate the will, change the devisees into tenants for life, and leave the testator intestate as to the remainders. *Moor* v. *Denn*, 2 B. & P. 247.

There is no such rule in this state, where inheritable titles, free from every vestige of feudalism, were one of the objects for which the wilderness was occupied, were the issue determined in favor of the people in the Masonian controversy, and have prevailed since the first towns divided their lands among the settlers. Their new home was a new world in a very comprehensive sense. For many of the advantages of an original organization of society, with which they began their work, they never ceased to contend. While many old rights which they brought with them are found in English history, the decision in *Cole* v. *Lake Co.*, is sufficient authority for applying to this case the common law that grows out of the institutions and circumstances of the country. *Concord Co.* v. *Robertson*, 66 N. H. 1, 6, 7, 15, 17, 19; *State* v. *Saunders*, 66 N. H. 39, 72, 73. A plain provision of a deed

or will should not be expunged or altered by importing a method of construction or a rule of law founded on, or developed by the spirit and influence of, an oppressive policy in regard to the tenure of land, from which our ancestors liberated themselves by migration.  If such methods and rules were properly adopted in England, they are precedents for contrary methods and rules under opposite conditions.  The policy of servitude, which produced the feudal rule against grants, reservations, and devises of estates of inheritance, being inapplicable to our situation and circumstances, it would be impossible to justify a judicial introduction of that rule (in either of its forms), or a survival of feudal prejudice against competent evidence of contractual or testamentary intent.

"The English common law of real property . . . is founded upon the doctrines of the feudal system. . . . When land was conveyed to the tenant or vassal, it was called a feud, fief, or fee. It was at first only for the life of the tenant.  Under the early feudal system an estate of inheritance was unknown.  Afterwards it became customary to grant a fief or feud to a tenant and his sons, and subsequently to him and his heirs.  For a long time after the conquest a vassal could not alien his land without the consent of the lord.  It was a personal confidence reposed in him, and a full power of alienation would have enabled him to let an enemy of the lord into possession of his lands. . . . So obsolete has the ancient doctrine of tenures become, that writers of eminence unhesitatingly pronounce the lands in this country to be absolutely allodial, *i. e.*, free from the burdens of tenure."  Tied. R. P., *ss.* 20, 21, 25.  The rule of construction against an estate of inheritance, applied in one form to deeds and in a softened form to wills, is a relic of the system in the early ages of which an estate of inheritance was unknown.  In this state, where that system has not existed, and the branch of the rule applied to English deeds has not been introduced, a described tract of land conveyed or reserved by deed, and reduced to a life estate by the branch applied to English wills, would be an anomalous instance of feudal taint.

The remark that the technical description of a fee contained in the word "heirs" "could not now be safely omitted without using some other form of expression showing with legal accuracy the intention and contract of the parties" (*Cole* v. *Lake Co.*, 54 N. H. 242, 290), is to be read with the accompanying statement that "the word is no more necessary to the valid conveyance of land than to the valid conveyance of a horse," and with the decisions in which it is settled that the actual intent of the parties, proved by competent evidence, is the legal meaning of a deed, and that the question of intent is a question of probability, to be determined by the ordinary and popular sense of

the deed when its language does not appear to have been used in a technical or peculiar sense. In this mode of construction, an unqualified grant or reservation of land shows with legal accuracy an intent to convey or reserve nothing less than the grantor's interest in the described land; and an unqualified grant or reservation of the right to flow a described lot is a grant or reservation of an interest not less durable than the grantor's right of flowing that lot. A common form of quitclaim grant describes the premises as "all my right, title, and interest in a certain tract of land," or "all my right, title, and interest in" a certain easement. A warranty deed of the land or easement is not less effective than a quitclaim of all the grantor's right, title, and interest; and a reservation of a described right of flowage is as strong as a reservation of "all my title and interest in" such a right.

The authorities show how ideas and principles inherent in a community of lords and vassals have outlived the military and social system to which they belonged, what injustice has been done by the original form of the feudal rule applied to deeds, and by a modified form of it applied to wills, and what consequences would follow the enactment of either form in this jurisdiction.

"The rule of law is inflexible. To create an estate of inheritance by deed, except by a deed to a corporation, and one or two other special exceptions, . . . the land must be conveyed to the grantee *and his heirs;* and no words of perpetuity will supply the omission of these necessary words of limitation. A grant to a man to have and to hold to him forever, or to have and to hold to him and to his assigns forever, will convey only an estate for life. And the same rule applies to words of reservation." *Curtis* v. *Gardner,* 13 Met. 457, 461; *Buffum* v. *Hutchinson,* 1 Allen 58, 60; *Sedgwick* v. *Laflin,* 10 Allen 430. "The operation of an exception in a deed is to retain in the grantor some portion of his former estate, which by the exception is taken out of or excluded from the grant; and whatever is thus excluded remains in him as of his former right or title, because it is not granted. A reservation or implied grant vests in the grantor in the deed some new right or interest not before existing in him. . . . The same rules of construction apply to a reservation or implied grant as to an express grant. In this case, the words used were 'reserving to myself the right of passing and repassing, and repairing my aqueduct logs forever through a culvert.' This gave only an estate for life. . . . To create an estate of inheritance by deed to an individual, the land must be conveyed to the grantee and his heirs, and these necessary words of limitation cannot be supplied by other words of perpetuity." *Ashcroft* v. *Railroad,* 126 Mass. 196, 198, 199.

A deed from Merrifield to Cobleigh contained the following clause : " Reserving, however, to myself the privilege of a bridle-road in front of the house." " In a deed to an individual," say the court, " the word 'heir' is necessary to create an estate of inheritance in the grantee. . . . The same rule applies to a reservation which operates by way of an implied grant. When a clause in a deed is strictly an exception, taking out of the grant some portion of the grantor's former estate, as if one should convey his farm excepting the wood lot, the part excepted would remain in the grantor as of his former title, because not granted. But when the effect of the clause is to create some right or easement not before existing, it is, properly speaking, a reservation, and is generally considered as operating by way of an implied grant. . . . Merrifield, while he was the owner of the lots now held by the plaintiff and the defendant, had the right to pass and repass over any part of his estate, but no right of way, properly speaking, existed over the plaintiff's lot. This easement or servitude in favor of the lot retained by Merrifield was a new interest in real estate, created by the reservation and its acceptance by the grantee in the deed. As the reservation contains no words of inheritance, it follows . . . that Merrifield had only a life estate in the easement." *Bean* v. *French*, 140 Mass. 229, 231.

" An exception may be created by words of reservation. . . . Whether, in a given case, the language shall be construed to create an exception or a reservation, will depend upon the situation of the property and the surrounding circumstances." *White* v. *Railroad*, 156 Mass. 181, 185. "According to the English law, a right of way cannot strictly be made the subject of an exception or a reservation, because, as stated by Chief Justice *Tindal*, in *Durham, etc., Railway* v. *Walker*, 2 A. & E. N. S. 940, 967, 'It is neither parcel of the thing granted, nor is it issuing out of the thing granted, the former being essential to an exception, and the latter to a reservation.' If, therefore, an easement is excepted or reserved in a deed, it operates by way of grant from the grantee to the grantor. . . . In such a state of the law, the word 'heirs' must be used to create an easement in fee. In this commonwealth, however, an easement may be created by way of exception or reservation. . . . If created by way of reservation, the word 'heirs' is necessary to create an easement in fee. *Ashcroft* v. *Railroad*, 126 Mass. 196; *Bean* v. *French*, 140 Mass. 229. But if created by way of exception, the word 'heirs' is not necessary to create an easement in fee. . . . *Wood* v. *Boyd*, 145 Mass. 176; *White* v. *Railroad*, 156 Mass. 181. As an exception may be created by words of reservation (*Wood* v. *Boyd, supra*), little reliance can be placed upon the language used in determining whether the right is by way of exception or by way of

reservation. . . . In *White* v. *Railroad, supra,* where the easement was held to be perpetual, the language was, 'reserving the passageway at grade over said railroad where now made,' and the deed purported to release the railroad from all damages from maintaining the railroad. The defendant had also previously taken the land by its location. In deciding that the right of way was by way of exception and not by way of reservation, reliance is placed on all these facts, including the fact that the passageway was already existing when the deed was executed. In the case at bar the defendant had not already taken the land by its location, . . . and there was no evidence of an existing way across the land. The construction of the deed, therefore, is determined by *Bean* v. *French, supra,* and the right of way must be taken to have been acquired by way of reservation, and not by way of exception." *Claflin* v. *Railroad,* 157 Mass. 489, 492, 494.

If the softened form of the feudal rule against inheritable estates had been substituted for the other form in the construction of deeds, less injustice would have been done than has been done. In some cases, in which a fee, intended by the parties, has been changed into a life estate by the form that requires the word " heirs," the softened form (which has been applied to wills) would not have done the same wrong. In some cases, perhaps in many, it would not have been strong enough to nullify the competent evidence of intent. But its existence is not justified by its being less capable of mischief than another form of the same rule. Its only effect in the construction of wills has been to change an intended fee into a life estate ; and it could have no other effect in the construction of deeds.

" It is . . . the constant confession of the English judges, that" rules of construction, "when arbitrarily and unflinchingly followed, often lead one side of the most obvious intent of the testator. . . . In the great majority of cases, where the devise has been cut down or restricted to a life estate, upon the mere ground that there were no words importing clearly that any larger estate was intended to pass, it has resulted in defeating the intention of the testator." Red. Wills, 420, 421.

A man having personal estate and a fee in land, devised his land, adequately described, to his nephews, M., G., and T., gave 10 s. to J., his heir at law, and several small legacies to other relations, and made M., G., and T. residuary legatees, evidently supposing that the bequest of 10 s. to his heir, other legacies to other relations, and the residue of his personalty to his nephews, would vest in the legatees all the title he had to that kind of property, and that the devise of his land to his nephews (emphasized by the legacy of 10 s. to his heir) would vest in the devisees all the title he had to the land. He was not aware that while a

gift of personalty made the donee the owner, an ancient rule had so far survived the reason of its existence that giving him land made him a tenant for life. The feudal distinction was maintained by the king's bench in violation of the elementary rule that a writing is to be understood in the ordinary, natural, and popular sense of its terms when they do not appear to have been written in a peculiar sense. It was held that the devisees took only a life estate in the land, and that the heir took the remainder notwithstanding the plainly expressed intent that the nephews should have the land, and the testator's manifest understanding that the land he devised to them was the whole land title. "The law," says Lord *Mansfield*, "implies a life estate only, where there are no words of limitation. . . . There must be words in the will to control the rule of law, which I believe in a variety of cases thwarts the intention of the testator. I suspect extremely that in this very case the testator meant to give his nephews a fee." "I really think," says *Aston*, J., "from the circumstances of the testator giving 10 s. to his heir at law, he meant to disinherit him." *Denn* v. *Gaskin*, Cowp. 657, 659, 660.

"I verily believe that in almost every case where by law a general devise of lands is reduced to an estate for life, the intent of the testator is thwarted; for ordinary people do not distinguish between real and personal property." Lord *Mansfield* in *Right* v. *Sidebotham*, 2 Doug. 759, 763. "In many of the cases . . . in which it has been decided that the first devisee was only entitled to a life estate, one cannot but suspect, privately speaking, that it was the intention of the devisor to give the absolute property to the first taker; and Lord *Mansfield* used to observe that the common class of men imagined that they could devise a fee-simple by the same words that are sufficient to give a piece of plate. . . . Whatever our conjectures may be (and, privately speaking, I think the devisor meant to give an estate in fee to his wife), we are not at liberty to follow those conjectures, but are compelled by the authorities to say that she only took an estate for life." Lord *Kenyon*, in *Denn* v. *Mellor*, 5 D. & E. 558, 562, 563. "Though it may be assumed, as Lord *Mansfield* once said, that in almost every case where property is devised to one generally, the testator means to give a fee; yet we are tied down by a positive rule of law." Lord *Ellenborough*, in *Goodright* v. *Barron*, 11 East 220, 222. "We are bound," says *LeBlanc*, J. (in the same case, *p.* 223), "by a rule of law contrary to what I think was the probable intention of the testator in this case, to say that the widow only took a life estate."

"If a man by deed of conveyance at common law gives land to another generally, without words of limitation, the donee has only an estate for life. But I really believe that almost every case determined by this rule, as applied to a devise of lands in a

will, has defeated the real intention of the testator. For common people, and even others who have some knowledge of the law, do not distinguish between a bequest of personalty, and a devise of land or real estate. But as they know when they give a man a horse they give it him forever, so they think if they give a house or land it will continue to be the sole property of the person to whom they have left it. Notwithstanding this, where there are no words of limitation, the court must determine, in the case of a devise affecting real estate, that the devisee has only an estate for life; because the principle is fully settled and established, and no conjecture of a private imagination can shake a rule of law. But as this rule of law has the effect I have just mentioned, of defeating the intention of the testator in almost every case that occurs, the court has laid hold of the generality of other expressions in a will, where any such can be found, to take the devise out of this rule. . . . In general, wherever there are words and expressions, either general or particular, or clauses in a will which the court can lay hold of to enlarge the estate of a devisee, they will do so to effectuate the intention. But if the intention of the testator is doubtful, the rule of law must take place. So if the court cannot find words in the will sufficient to carry a fee, though they should themselves be satisfied beyond the possibility of a doubt as to what the intention of the party was, they must adhere to the rule of law." *Loveacres* v. *Blight*, Cowp. 352, 355.

"I am satisfied that the idea expressed by Lord *Mansfield*, in *Loveacres* v. *Blight*, is correct. . . . 'Almost every case determined by this rule . . . has defeated the real intention of the testator. For common people . . . do not distinguish between a bequest of personalty and a devise of land.'" *Sedgwick*, J., in *Richardson* v. *Noyes*, 2 Mass. 56, 59. Lord *Mansfield* "did not explain by what authority the court has laid hold of the generality of other expressions in a will to take the devise out of this rule, . . . provided it is a rule of law that the word 'heirs' is indispensable to the passing of a fee. . . . By what right can the courts say that the intention of a testator plainly written in his will shall govern, but the intention of a grantor as plainly written in a deed of bargain and sale shall be set at naught, the consideration of the sale be disregarded, and the property be thrust back upon the grantor or his heirs, on the death of the grantee, for the want of this feudal word of inheritance? In the nature of things the word is no more necessary to the valid conveyance of land than to the valid conveyance of a horse." *Cole* v. *Lake Co.*, 54 N. H. 242, 289.

In *Wright* v. *Denn*, 10 Wheat. 204, the testator died without issue, and a clause of his will showed that he was childless at the date of his will, eight months before his death. In the will,

using the words "give and bequeath," he made general gifts of money to three sisters, and by the same words he made a general gift to his wife of all his realty, describing it as "all and singular my lands, messuages, and tenements," intending and clearly expressing his intention to dispose of his whole title.   He evidently understood that all his lands included not only all his soil, but also all his interest in it, and that the whole title of the land he gave to his wife did not need a more  extensive or more specific description than the whole title of the money he gave to his sisters.   He was not·aware that, in the peculiar language of the officials by whom his will would be construed, all his land was not all his interest in land, but a different interest that might not last an hour.   In disregard of the ordinary, natural, and popular meaning of the will, and of the natural presumption that he intended to dispose of his whole title (*Kennard* v. *Kennard*, 63 N. H. 303, 311), it was held that his wife took a life estate only, and that as to the remainder he died intestate.   " It is not sufficient," says *Story*, J., delivering the opinion, "that the court may entertain a private belief that the testator intended a fee; it must see that he has expressed that intention with reasonable certainty on the face of his will.   For the law will not suffer the heir to be disinherited upon conjecture.   He is favored by its policy. . . . We cannot find a sufficient warrant in the words of this will to pass a fee to his wife.   The testator may have intended it, and probably did, but the intention cannot be extracted from his words with reasonable certainty, and we have no right to indulge ourselves in mere private conjectures."

The legislature have empowered an owner of property to dispose of it by will, and have determined who shall inherit it if his testamentary power is not exercised.   A partiality that favors heirs at the expense of devisees, or prefers devisees to heirs, is not a policy of New Hampshire common law, but a violation of it.   The question whether a general devise of a described tract of land, or of "all and singular my lands, messuages, and tenements," was intended to give all the testator's title, or to dispose of only a life estate, and leave him intestate as to the remainder, is determined as a question of fact, upon an impartial consideration of all competent evidence, by balancing probabilities, and not by technical rules.   *Rice* v. *Society*, 56 N. H. 191, 197, 198, 203; *Brown* v. *Bartlett*, 58 N. H. 511; *Kimball* v. *Lancaster*, 60 N. H. 264; *Goodale* v. *Mooney*, 60 N. H. 528, 534, 535; *Sanborn* v. *Sanborn*, 62 N. H. 631, 643; *Kennard* v. *Kennard*, 63 N. H. 303, 310; *Bodwell* v. *Nutter*, 63 N. H. 446; *Kimball* v. *Bible Society*, 65 N. H. 139, 150.   His probable knowledge or want of knowledge may be evidence of his probable intent.   " It is a thousand to one that the testator . . . knew nothing of that artificial reasoning which gave rise to the expression *indefinite failure*

*of issue*, and probably had never heard it." *Sedgwick*, J., in *Richardson* v. *Noyes*, 2 Mass. 56, 66. "It is a far-fetched and somewhat startling supposition, that the testator must have been conversant with Coke upon Littleton, and the profound maxim, *nemo est hæres viventis.*" *Williams*, J., in *Winter* v. *Perratt*, 6 M. & G. 314, 334. "The testator . . . was not aware of the distinction between real and personal estate." *Thellusson* v. *Woodford*, 13 Ves. 209, 222. It is as true in this country as in England, that "common people, and even others who have some knowledge of the law," are not familiar with the relaxed feudal rule concerning a devise of an estate of inheritance. To apply that rule to their wills or deeds is to disregard the evidence of intent furnished by the probable extent of their information.

In *Wright* v. *Denn*, above cited, an intent to devise all the land title the testator had was proved beyond reasonable doubt by competent evidence. In this state, the intent duly proved and the statutory rights of testator and devisee are not defeated by a spirit of favoritism that sets aside the conclusion reached by a performance of the judicial duty of weighing legal proofs and balancing probabilities. The rejection of such a conclusion as a private and unauthorized conjecture exhibits in a clear light the mode of construction in which the acknowledged meaning of written instruments is overridden by arbitrary rules. Among the most instructive decisions are those in which the employment of this method in the accomplishment of this result is accompanied by a confession of the wrong. Authorities of this class (some of which have been cited), and others based on the same theory — that testamentary or contractual intent, found by weighing competent evidence in the balance of probability, is legally overthrown by unwritten rules of construction,— affirm the soundness of opposite results in a jurisdiction where the intent, so found, prevails over those rules.

The conclusive argument on the duration of Cross's reserved easement is,— it does not appear more probable than otherwise that the reservation was understood by the grantor and grantee in a peculiar sense; and the common and substantially universal understanding is, that a conveyance or reservation of any piece of property, real or personal, is a conveyance or reservation of the grantor's interest in it. *Richardson* v. *Noyes*, 2 Mass. 56, 61. People in general do not regard the feudal word of inheritance, or other specific reference to the perpetuity of the estate, as more needed in a conveyance of described realty than in a conveyance of shares of an incorporated land company. Reading this reservation, as our law requires it to be read, for the purpose of giving effect to the actual intent of the parties, "a piece of land" is the fee; "the right of flowage" is a perpetual estate; a life estate that is not mentioned is not created. "Reserving to myself" a

right of flowage, as a part of a reserved mill privilege, does not express the grantor's purpose to cut off his heirs by severing the appurtenance from the rest of the privilege at his death. The feudal rule, in the modified form in which it has been applied to wills, as well as in the original form in which it has been applied to deeds, is one of the formulas that our common law does not use to thwart the purpose of testators or contracting parties.

The mere acceptance of correct views of the law does not remove all danger of erroneous construction. In this case, it is not enough to admit that the feudal rule, in its original form, requiring the word "heirs" as evidence of intent to convey the whole title, is no part of our law, and that the court have no power to enact it in the modified form that requires more evidence of such intent in a written sale or devise of a farm than in a written sale or bequest of a chattel or chose in action. The right of grantors and devisors to use language in its popular sense may be infringed when that sense is not understood by judges who labor under an educational bias, and are unduly impressed by the feudal idiom of the printed forms habitually used by the profession. Interpreters of deeds and wills may err because they are more familiar with legal phraseology than with the terms in which the mass of their neighbors express themselves on legal subjects. A full and exact knowledge of both languages is often needed in determining in what sense a word or phrase was used by a grantor or devisor. The statutory provision that "Every devise of real estate shall be holden to pass all the estate of the devisor therein, unless it shall appear that it was his intention to pass a less estate" (P. S., c. 186, s. 6), is a partial enactment of New Hampshire common law, which maintains a grantor's as well as a devisor's right to use the language of the people in the sense in which they understand it. The statute is a recognition of the fact that a devise of land is commonly understood to pass all the devisor's interest in it, unless it appears that it was his intention to pass a less estate. And in this respect a devise and a grant are commonly understood in the same sense.

VI. Cross conveyed to "Wilson and his heirs and assigns forever a certain piece of land, . . . reserving to myself . . . also reserving . . . to have and to hold the said premises . . . to him the said Wilson his heirs and assigns forever." The printed form of conveyance generally used in this state runs " unto the said —— his heirs and assigns forever." If a reservation had been printed in the same form, its verbal structure would probably have harmonized with the context. "Reserving to the said grantor, his heirs and assigns forever," would preserve a uniformity of style. There being no such clause in the blank deed, a trap would be set for grantors if "heirs" were held to be a

material word in Wilson's contract. The number of persons who use the printed form of the grant as a model in drafting a reservation is small, and the number of those who make constant use of feudal phraseology in their original compositions is smaller still. The consequence is, that a deed containing a reservation of an easement generally furnishes ground for arguing that the grantor intended to convey a fee and reserve a life estate. If this was not his purpose, why did he mention the grantee's heirs in the premises and habendum, and omit his own in the reservation?

The premises and habendum of the common form are extracts from ancient English precedents, drawn with a degree of redundancy, technicality, and cumbersome formality that is foreign to the purpose of a New Hampshire deed. In procedure we have "happily lost a great mass of antiquated and useless rubbish." *B. C. & M. Railroad* v. *State*, 32 N. H. 215, 231. In conveyancing there has been a similar loss. 2 Bl. Com., App.; Wood Conv., *passim;* Bell's Justice and Sheriff (ed. 1856) 452. And a large part of what remains is unserviceable and sometimes misleading. It muddles a simple business transaction with irrelevant learning that seems to suggest something recondite, and goes to support unsound views of American law. The habendum " has degenerated into a mere useless form." 4 Kent 468. When A sells his farm to B, and exercises what power he has to transfer his title and make B the owner by saying, in a paper duly signed, sealed, witnessed, acknowleged, and delivered, " I convey my [described] farm to B " (4 Kent 461), an iteration of the perpetual character of the estate has no more effect than the mere duplication often found in the description of its territorial extent. While the most reasonable meaning of every word of a deed is to have due weight as evidence of actual intention, the words " give, grant, bargain, sell, alien, enfeoff, convey, and confirm " are unnecessary (*Brown* v. *Manter*, 21 N. H. 528; *Currier* v. *Janvrin*, 58 N. H. 374; *Fletcher* v. *Chamberlin*, 61 N. H. 438, 474, 475; *Bronson* v. *Coffin*, 108 Mass. 175, 180), and so far as they have any probative force they are synonymous. Giving them eight meanings instead of one would be a distortion of the evidence. Customary words and phrases of perpetuity that have been transmitted from former times are to be read in the light of their history. A false gloss is not to be put upon repetitions evidently due to abundant caution, or to the use of forms that originally had a significance they cannot have here in the absence of the institutions and conditions to which they were adapted, and of which they were products and incidents.

When a blank deed comes from the printer's hands, " his heirs and assigns forever," like " give, grant, bargain, alien, enfeoff, and confirm," is surplusage. Whether it is erased or not, does

not matter.   It is a needless repetition of the idea of perpetuity fully expressed in the preceding word "sell," and repeated again and again in the words of grant.   Upon a consideration of what is probable, it cannot be found that, in a written reservation, the parties abstain from the barren verbiage of the printed form for the purpose of giving the printed word "heirs" an evidential force which it did not have before the reservation was inserted. They may hold the correct legal view of the printer's work.   They may rely upon their scrivener's supposed knowledge of his business, having themselves no sufficient motive for seeking instruction on so technical a subject.   Their reliance upon an incorrect view of the printed word "heirs" to affect the meaning of the written reservation is a conjecture that passes the bounds of probability.   Their good faith and contracting capacity being presumed, it is incredible that a purpose to reserve a life estate is intentionally left to be inferred from the non-erasure of the superfluous word "heirs" in the print, and their non-use of it in the writing.   If the whole deed is written, and the grant is an ancient form, the contrast of the reservation, composed in this country, and the form dictated to foreign draftsmen by foreign law, may not prove a reservation of a life estate.   The mixed authorship may be as apparent as if the reservation were written in a printed frame.   *Sanborn* v. *Sanborn,* 62 N. H. 631, 647.

In the minds of Cross and Wilson, "reserving to myself . . . the right of flowage, . . . also reserving a piece of land . . . one acre," might be a reservation of the flowage, and an exception of the acre.   They might hold the erroneous opinion that Cross's interest in the right of flowage, reserved as an appurtenance of his land, would be a life estate.   They might suppose that some form of a feudal rule would be applied to a reservation, and that no form of it would be applied to an exception. With this mode of construction in view, instead of saying "reserving" the flowage, and "excepting" the acre, they might say "reserving" the flowage, "also reserving" the acre.   Studiously avoiding plain and express terms (such as "reserving the right of flowage for and during the term of my life") that would be intelligible to all, and would naturally be used by every scribe, expert or inexpert, they might prefer the useless and aimless risk of an attempt to exclude an estate of inheritance by a refinement in the use and non-use of surplusage, which not one person in a thousand would understand.   But such possibilities have no bearing on the question of probability.

VII.   "When nothing passeth to the feoffee or grantee before election to have the one thing or the other, there the election ought to be made in the life of the parties, and the heir or executor cannot make election.   But when an estate or interest

passes immediately to the feoffee, donee, or grantee, there election may be made by them, or by their heirs or executors." Co. Lit. 145 a. The intent, proved by competent evidence, is the contract that determines whether the title passes before election or afterwards. Under the feudal rule against inheritable interests in realty, it is not strange that a grantee's right of selecting his land, like the land itself, would not go to his heirs without such an expression of the grantor's intent that it should go to them as would be superfluous in this state. When the sway of ideas generated in feudal ages was absolute, and contractual rights were largely determined by arbitrary rules, with much less search for the intent of the parties than is now made, it is not strange that a sale of one of three horses should be held to require the election " to be made in the life of the parties." *Heyward's Case,* 2 Co. 35, 36. In such a case the purchaser has an election if the parties understand he is to have it ; and it may be inferred that, for the agreed price, the vendor gives the vendee his choice. If the vendee pays the price when the bargain is made, and instantly dies, it is not a matter of law that the parties were so actuated by feudal hostility to inheritable rights as to intend that the right of election, sold by one and paid for by the other, should be a life estate. When the location of granted premises is to be made certain by election, the title passes to the grantee when the deed is delivered, and if the right of election, passing to him as an incident of the title, is not exercised by him, it passes by his conveyance of the land. *Armstrong* v. *Mudd,* 10 B. Mon. 144.

The proposition that Cross conveyed the acre to Wilson with an implied stipulation that it should revert to the grantor if he located it, or that any right was conveyed with such a defeasance, or that, on any theory, the grantor lost or failed to regain any property by not locating it, would be in conflict with general principles of property, conveyancing, construction, and remedial law that have been already considered. If, by an ancient rule, the title of any of the reserved property would pass to Wilson, and could only be revested in Cross by his exercising a right of election, this rule, like the different forms of the feudal rule governing grants, reservations, and devises of perpetual interests, is irrelevant where the law finds the contractual intent in the written instrument, understood in its ordinary and popular sense. When that sense is evidently what the parties meant, it is not suppressed in this state by a rule which the legislature have not seen fit to adopt. In Cross's grant and reservation there is no evidence that the parties understood his perpetual interest in any part of the reserved property was conveyed, and there is an intrinsic probability that he did not intend his existing and reserved title should depend upon his living long enough to make

a selection and survey.   Until the right of election was exercised there was an ownership in common conformable to the proprietary rights which the deed conveyed, and the proprietary rights which the reservation shows the deed did not convey.   There was a tenancy in common because the deed conveyed, not the whole of the east section, but a part of it.   The title of what Cross reserved remained in him, and the seizin of that part remained with the title.   His exercise of the right of election could not be necessary to vest in him what the deed did not convey from him.   As the acre was his before he reserved it, and he could not lose it by reserving it, his property in it could not begin by subsequent election.   If it had been located by a decree on a bill in equity brought by Cross or Wilson, the title would not have begun when partition was decreed; and whether partition were made by process of law or by an exercise of the right of election, " a piece of land . . . one acre " would not be conveyed to Wilson, nor would the title be taken from Cross and left in abeyance, by the deed in which it was reserved.

The plaintiffs are entitled to judgment.

*Case discharged.*

CHASE, J., dissented : the others concurred.